T.C. Memo. 2005-16

UNITED STATES TAX COURT

CMA CONSOLIDATED, INC. & SUBSIDIARIES, INC., Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12746-01.                    Filed January 31, 2005.

<u>George W. Connelly, Jr.</u>, <u>Linda S. Paine</u>, and <u>William O.</u>
<u>Grimsinger</u>, for petitioners.

<u>Mary E. Wynne</u> and <u>Caroline Tso Chen</u>, for respondent.

CONTENTS

                                                            Page

Introduction and Statement of Issues....................... 3
Findings of Fact........................................... 5
I.  The Two Lease Strip Deals.............................. 6
    A.  Background......................................... 6
    B.  First Lease Strip Deal............................ 11
    C.  Second Lease Strip Deal........................... 19

D.  Other Aspects of Petitioner's Claimed Losses and
Deductions With Respect to the Second Lease Strip
Deal................................................ 29
II.  Petitioner's 1995 Through 1997 Advances to Cap Corp.
and the December 2, 1996, Debt Conversion Transaction.. 32
A.  Cap Corp. and Its Business........................ 32
B.  Petitioner's 1995 and 1996 Advances to Cap Corp.... 35
C.  The December 2, 1996, Debt Conversion Transaction.. 38
D.  Petitioner's 1997 Advances to Cap Corp............. 40
E.  Petitioner's 1997 Ordinary Loss and Bad Debt
Deduction; Petitioner's 1998 AeroCentury Stock
Transaction........................................ 41
1.  The $2 Million Consulting Fee.................. 43
2.  Petitioner's Advances to Koehler .............. 50
Opinion..................................................... 52
I.  Petitioner's Second Lease Strip Deal.................... 53
A.  Did the Underlying Transactions Have Economic
Substance?......................................... 54
1.  Generally...................................... 54
2.  Background and Recapitulation of the Two Lease
Strip Transactions............................. 57
3.  Petitioner's Rental Expense Deductions and Note
Disposition Losses............................. 62
4.  Did Petitioner Have a Nontax Business Purpose
for Entering Into the Second Lease Strip
Transaction?................................... 64
5.  Whether Petitioner's Lease Strip Deal Had
Economic Profit Potential Aside From the Tax
Benefits....................................... 70
a.  The Experts' Opinions..................... 74
i.  Petitioner's Expert.................... 75
(a) Svoboda's Opinions as to the Fair
Market Values and Estimated Residual
Values............................... 76
(b) Svoboda's Fair Market Value for
the Over Lease Residual Interests...... 77
ii.  Respondent's Expert.................... 79
b.  Evaluation and Comparison of the Experts... 82
c.  Petitioner's Lease Strip Deal's Economic
Profit Potential.......................... 85
6.  Conclusion as to the Economic Substance of
Petitioner's Lease Strip Deal.................. 86
B.  Petitioner's Entitlement to Its Claimed Deductions. 90
II.  Petitioner's $2,052,900 Ordinary Loss and $1,859,135
Bad Debt Deduction...................................... 91
A.  Petitioner's Claimed Deductions--the Debt vs.
Equity Issue....................................... 91
B.  Application of the 11-Factor Test.................. 94
1.  Names Given to the Documents.................. 94

        2.   Presence or Absence of a Fixed Maturity Date...  95
        3.   Source of the Repayment........................  97
        4.   The Right To Enforce the Payments..............  98
        5.   Participation in Management....................  99
        6.   Status Relative to Other Creditors............. 100
        7.   Intent of the Parties......................... 101
        8.   Thin or Adequate Capitalization............... 102
        9.   Identity of Interest.......................... 104
       10.   Payment of Interest Only Out of Dividends...... 105
       11.   Ability To Obtain Loans From Outside Lending
             Institutions.................................. 106
   C.   Conclusion and Holdings............................ 107
III. The $2 Million Fee................................... 110
   A.   The Assignment of Income Doctrine.................. 110
   B.   The Parties' Arguments............................ 112
        1.   Petitioner's Arguments........................ 112
        2.   Respondent's Arguments........................ 113
   C.   Analysis and Holding.............................. 114
        1.   Petitioner's Agreement With NSI............... 114
        2.   CKH's and Petitioner's Purported Fee-Splitting
             Agreement..................................... 114
        3.   Petitioner's Entitlement to a Business
             Deduction..................................... 118
IV.   Petitioner's Advances to Koehler...................... 119
V.    Is Petitioner Liable for Penalties Under Section 6662?. 122
Appendixes
   Appendix A--Flow Chart Reflecting the Basic Elements of
               the Transactions in the Two Lease Strip Deals. 129
   Appendix B--Summary of Appendix A........................ 132
   Appendix C--Existing End User Equipment Rental MonthlY
               Payments That HCA Purchased.................. 133

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Chief Judge</u>:  Respondent determined income tax

deficiencies, an addition to tax, and penalties with respect to

petitioner's[1] taxable years ended November 30, 1996 and 1997, as follows:

|  |  | Addition to Tax and Penalties | |
|---|---|---|---|
| TYE | Deficiency | Sec. 6651(a)(1) | Sec. 6662(a) |
| 11/30/96 | $320,375 | $16,019 | $90,609 |
| 11/30/97 | 1,729,294 | -- | 176,383 |

All section references are to the Internal Revenue Code, as amended and in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by the parties, the primary issues remaining for our consideration are: (1) Whether petitioner is entitled to approximately $2.7 million of deductions claimed for its taxable years ended November 30, 1996 and 1997, from a lease strip deal; (2) whether petitioner's lease strip deal has economic substance and is to be respected for Federal income tax purposes; (3) whether petitioner's claimed rental expense deductions arising from the lease strip deal are deductible as ordinary and necessary business expenses; (4) whether petitioner is entitled to claim note disposition losses from the lease strip deal; (5) whether the $2,259,900 that petitioner advanced to CMA Capital Corp. is to be treated as an investment (equity) or debt; (6) whether for its taxable year ended November 30, 1997,

---

[1]Petitioners make up an affiliated group of corporations that filed consolidated income tax returns for the years in issue. CMA Consolidated, Inc. (CMA), is the common parent corporation of that group. For convenience, we use "petitioner" to refer to that affiliated group of corporations.

petitioner is entitled to a deduction for a $2,052,900 ordinary loss from a debt conversion transaction; (7) whether petitioner is entitled to claim a $1,859,135 bad debt deduction for its taxable year ended November 30, 1997, with respect to loans petitioner purportedly made to CMA Capital Corp.; (8) whether petitioner should include in its income the $2 million portion of a consulting fee that petitioner paid to Crispin Koehler Holding Corp. in early 1997; (9) if the $2 million is includable in petitioner's income for its taxable year ended November 30, 1997, whether petitioner is entitled to deduct its payment of $2 million to Crispin Koehler Holding Corp. as a business expense; (10) whether petitioner is entitled to a $76,705 bad debt deduction for its taxable year ended November 30, 1996, with respect to its advances to Richard Koehler; and (11) whether petitioner is liable for penalties under section 6662 for its taxable years ended November 30, 1996 and 1997, with respect to portions of its underpayments for those years attributable to its claimed lease strip deal deductions.

## FINDINGS OF FACT[2]

Petitioner is a California corporation. At the time the petition was filed, petitioner maintained its office and principal place of business in Burlingame, California. At all

---

[2]The parties' stipulations of fact and the exhibits attached thereto are incorporated herein by this reference.

pertinent times, Neal Crispin (Crispin) owned 98 percent of CMA's outstanding stock and has been petitioner's ultimate decision maker.

Since its May 1992 incorporation, CMA Capital Management, Inc. (CMACM), has been a wholly owned subsidiary of petitioner and a member of petitioner's consolidated group.  Since its August 1983 incorporation, Capital Management Associates (CM Associates) has been a wholly owned subsidiary of petitioner and a member of petitioner's consolidated group.

I.   The Two Lease Strip Deals

     A.  Background

Petitioner was generally involved in equipment leasing transactions and the structuring of equipment financing.  During the early 1990s, petitioner began to arrange deals designed to separate equipment rental income from the related rental expenses.  In those deals, which were called "lease strips" and/or "rent strips", the rental income was allocated to a tax-indifferent or tax-neutral party in order to allow another party to claim a greatly disproportionate share of the related tax benefits.  Generally, a "tax-indifferent" or "tax-neutral" party is one that does not incur a Federal income tax liability on its income because of its status or its circumstances.

Examples would include a party that was not a U.S. taxpayer or a party that was a U.S. taxpayer but had large net operating losses available to offset income.

One such tax-indifferent party petitioner employed was the Iowa Tribe of Oklahoma (Iowa Tribe). Because of its status as an Indian tribe recognized by the Bureau of Indian Affairs of the U.S. Department of the Interior, the Iowa Tribe was not subject to Federal income tax on income allocated to it from lease strip deals.[3] The Iowa Tribe participated in approximately eight different partnerships during the mid-1990s and received fees for its participation as a limited partner in those partnerships. In exchange for its "modest investment" and agreement to be the 99-percent limited partner in a partnership, the Iowa Tribe received a fee ranging from $17,000 to $40,000 at the closing of each deal. The fee represented a percentage of the total commissions received by CMA in connection with the lease strip deal. The Iowa Tribe had no active role in the partnership and realized that its participation allowed others to exploit its tax-exempt status. A wholly owned CMA subsidiary and/or Crispin (CMA's 98-

_____

[3]The parties disagree over whether two lease strip deals involving petitioner that are discussed more fully infra had economic substance and should be respected for tax purposes. The terms "sale", "sold", "lease", "purchase", "income", "interest", "invest", "note", "obligation", "lien", and other similar terms are used herein for convenience and are not intended as ultimate findings or conclusions concerning the validity for tax purposes of the deals and/or underlying transactions in dispute.

percent shareholder and ultimate decision maker) often served as a 1-percent or less general partner of the partnership.

The two lease strip deals involve computer and photo processing equipment subject to two existing end-user leases. One end-user lease agreement, dated October 26, 1989 (hereinafter for convenience referred to as the K-Mart end-user lease or K-Mart lease), involved the lease of existing and after-acquired photo processing equipment by Varilease Corp. (Varilease) to K-Mart Corp. (K-Mart). On January 22, 1992, Computer Leasing, Inc. (CLI), purchased the equipment subject to the K-Mart lease along with Varilease's rights and obligations under the lease. On May 18, 1994, additional equipment was added to the K-Mart end-user lease. The other end-user lease agreement dated July 1, 1993 (hereinafter for convenience referred to as the Shared end-user lease or Shared lease), involved the lease of computer equipment by CLI to Shared Medical System Corp. (Shared).

Starting with the K-Mart and Shared end-user leases and certain other equipment leases with three other end users, a series of preconceived transactions was arranged with respect to that equipment. The transactions were intended to create residual lease periods beginning after the conclusion of the existing end-user leases with K-Mart, Shared, and the other end users. The transactions served as a foundation for two lease strip deals under which the rental income streams from the

equipment and the related deductions were bifurcated and allocated to different entities. Virtually all of the remaining rental income under the existing end-user leases with K-Mart, Shared, and other end users was stripped out and allocated to the Iowa Tribe (a tax-indifferent party not subject to Federal income tax). A wraparound equipment lease position (encompassing the existing end-user leases and the residual lease periods) and an equipment purchase installment note and/or payment rights thereto (previously issued in "taxable sale"-leaseback transactions either to the Iowa Tribe's partnership or another partnership in which the Iowa Tribe's partnership held an interest) were transferred to the respective lease strip deal's ultimate beneficiary/customer in a purported section 351 transaction. The principal and interest payments due under the equipment purchase installment note equaled, coincided with, and fully offset the rental payments due under the wraparound lease.

As structured, the two lease strip deals were intended to generate substantial potential tax benefits for each deal's ultimate beneficiary/customer in amounts grossly disproportionate to the beneficiary's economic investment in that deal. For instance, the first lease strip deal's ultimate beneficiary/ customer would claim equipment rental deductions over the wraparound lease's entire life, even though (1) substantially all of the related rental income from the equipment had been stripped

out and (2) the rental payments that the beneficiary deducted were fully offset by the payments due the beneficiary under the equipment purchase installment note. The ultimate beneficiary/ customer's potential net tax benefits in the first lease strip deal equaled the total rental payments due under the wraparound lease less the interest portion of the installment note payments. According to a tax opinion issued to CFX Corp. (CFX) (the first lease strip deal's ultimate beneficiary/ customer), while the economic cost of the deal to CFX would be approximately $2.9 million, the deal would generate approximately $13.8 million in potential net tax deductions for CFX over the life of the wraparound lease.

In each of the two lease strip deals, the ultimate beneficiary/customer's only prospect of realizing a pretax economic profit on the deal essentially depended upon whether the rental income produced during the wraparound lease residual periods would exceed the economic investment in the deal. In addition, although a series of complex multiparty transactions (which are discussed in more detail infra) was required to implement each of these two lease strip deals, typically, the beneficiary/customer infused the only noncircuitous cash paid to participants, brokers, lawyers, and others involved in setting up that deal.

B.  <u>First Lease Strip Deal</u>[4]

As to the first lease strip deal, the following complex multiparty equipment purchase, lease, and related transactions were entered into on November 1, 1994, November 30, 1994, December 2, 1994, and January 3, 1995.

1.  On November 1, 1994, CLI sold, subject to the existing end-user leases, the equipment leased to K-Mart and Shared, along with some equipment leased to others, to Equity Resource Acquisition II (ERA), a limited partnership, for $13,919,451. ERA was a special-purpose entity created and controlled by CLI for the express purpose of accomplishing the purchase and sale of the leased equipment.  In exchange for the leased equipment package, ERA assumed the debt incurred by CLI to finance the equipment purchase.  ERA also issued a $2,307,500 secured recourse promissory note to CLI, payable within 60 days, with accrued interest at 10 percent.

2.  In turn, on November 1, 1994, ERA sold the leased equipment for $15.05 million, subject to the existing end-user leases, to Capital Finance Partners (CFP), a limited partnership. The partners of CFP were:  The Iowa Tribe--a 99-percent limited partner; CMACM--a .05-percent managing general partner; Crispin--

_____

[4]Although petitioner's subject deductions were derived from the second lease strip deal, we detail the first deal for purposes of clarity and to provide a background for discussion of the second deal.

a .05-percent individual general partner; and Mithril Corp.--a .9-percent corporate general partner. In exchange for the leased equipment, CFP issued its $15.05 million recourse promissory note bearing 8 percent interest, payable within 60 days to ERA. The $15.05 million CFP promissory note was executed on behalf of CMACM (as CFP's general partner) by Gregory W. Johnson (Johnson), a vice president of petitioner. After the respective sales to ERA and CFP in steps 1 and 2, the leased equipment remained subject to the debt incurred by CLI to purchase the equipment, and liens that CLI had placed on the equipment and rents due under the existing end-user leases. In addition, following ERA's sale of the equipment to CFP, ERA placed liens on the equipment to secure payment of CFP's $15.05 million note to ERA.

3. Also on November 1, 1994, CFP sold the leased equipment for $14,872,910 to EQ Corp. (EQ), subject to the existing end-user leases to K-Mart, Shared, and others. ERA consented to the sale of the leased equipment from CFP to EQ. Joel Mallin (Mallin), a lawyer in New York, held a major and/or controlling interest in EQ and its vice president was Joel Klein (Klein), who rented office space from Mallin. EQ paid for the leased equipment by issuing to CFP a "$14.125 million Secured Limited Recourse Installment Note" and a "$747,910 Secured Recourse Promissory Note", both of which had a 12-percent interest rate. The $14.125 million installment note was payable:

(i) in eleven (11) equal consecutive semi-annual installments of $1,446,718 on April 30th and October 31st of each year, and (ii) thereafter in five (5) equal consecutive semi-annual installments of $501,782 on April 30th and October 31st of each year, commencing April 30, 1995, through and including October 31, 2002.

The $747,910 short-term promissory note was payable 60 days after November 1, 1994. CFP also placed liens on the equipment to secure EQ's note obligations to CFP.

4. On November 1, 1994, after CFP's sale of the equipment to EQ in step 3 above, CFP leased the equipment back from EQ under a wraparound lease encompassing the existing end-user equipment leases (master lease). The existing Shared and K-Mart end-user leases expired no later than March 29 and July 31, 1997, respectively. The master lease expired on April 30, 2000, for the Shared equipment, and on October 31, 2002, for the K-Mart equipment, respectively.[5] The master lease, among other things, provided that CFP's master lease residual interests in the K-Mart and Shared end-user lease equipment consisted of residual periods

---

[5]The master lease also covered: (1) Computer equipment subject to an existing end-user lease with the Health Ins. Plan of Greater N.Y. (HIP NY), (2) computer equipment subject to an existing end-user lease with Martin Marietta Corp. (Martin Marietta), and (3) satellite dish equipment subject to an existing end-user lease with Amoco Corp. (Amoco). The HIP NY end-user lease expired on Dec. 31, 1997; the Martin Marietta end-user lease expired on May 31, 1997; and the Amoco end-user lease expired on Mar. 31, 2000. As to this foregoing equipment, the master lease ran: (1) From Nov. 1, 1994, through Apr. 30, 2000, in the case of the HIP NY equipment; (2) from Nov. 1, 1994, through Apr. 30, 2000, in the case of the Martin Marietta equipment; and (3) from Nov. 1, 1994, through Oct. 31, 2002, in the case of the Amoco equipment.

between March 29, 1997, and April 30, 2000, and July 31, 1997, and October 31, 2002, respectively, all of which followed the existing leases. It also provided that CFP had the right to receive rents on the K-Mart and Shared equipment during its master lease residual periods. The master lease rental payments due from CFP to EQ were equal to, coincided with, and were fully offset by the installments owed to CFP by EQ under the $14.125 million equipment purchase note.

5. On November 1, 1994, Johnson executed, on behalf of CMACM in its capacity as managing partner of CFP, a remarketing agreement with CLI (master remarketing agreement) providing that CLI would be the exclusive remarketing agent for the leased equipment for the period between the expiration of the K-Mart and Shared end-user leases and the expiration of the master lease. The master remarketing agreement provided that revenue and proceeds from the lease, sale, or disposition of the leased equipment would be applied in the following order: (1) Senior financing; (2) reimbursement of CLI's expenses; (3) reimbursement of CFP's (sublessor's) expenses; (4) payment of a 5-percent fee to CLI; and (5) payment of any remainder to CFP (sublessor). The master remarketing agreement also provided that the sublessor (CFP) could terminate the agreement if, among other events, CLI ceased its remarketing activities, filed for bankruptcy, or failed to perform its obligations under the agreement. In

addition, CFP would be entitled to terminate CLI's exclusive remarketing agency if an item of equipment was not leased for more than 120 days and CLI had not presented a remarketing opportunity within that 120-day period.

6. Also on November 1, 1994, EQ and CLI entered into a remarketing agreement (owner remarketing agreement) providing that CLI would be responsible for the remarketing of the leased equipment after the master lease's term expired. The owner remarketing agreement, with respect to the application of rent proceeds, had identical terms to those contained in the above-described master remarketing agreement between CFP and CLI.

7. On November 30, 1994, CFP sold for $11,773,040 to Hitachi Credit America Corp. (HCA) its right to the rental income from the existing end-user leases on the K-Mart, Shared, and other equipment in a transaction described as a "rent strip sale". CFP, in turn, paid the $11,773,040 to ERA in satisfaction of the senior debt that encumbered the leased equipment. Simultaneously with the rent strip sale to HCA, CLI, ERA, and CFP agreed to release their liens against the rents to become due under the K-Mart, Shared, and other end user leases. CLI and ERA, but not CFP, subordinated their claims against the leased equipment to the rights of HCA. Thereafter, K-Mart, Shared, and other end users were also instructed to pay the rent due from

them under their end-user leases on the equipment directly to HCA. CFP allocated 99 percent of its income from the rent strip sale with HCA to the Iowa Tribe.

The net effect of the series of November 1994 transactions described above in steps 1 through 7 was for virtually all rental income realized from the rent strip sale to HCA to be attributed to a nontaxable entity (the Iowa Tribe), with the rental payments due thereafter under the existing end-user leases on the equipment to be paid to HCA.

8. About 2 days later, on December 2, 1994, CFP sold for $450,000 to Asset Residco, Inc. (Residco), CFP's interests as to (1) the first 2 years of the master lease residual period with respect to the K-Mart end-user lease equipment and (2) the first 6 months of the master lease residual period with respect to the Amoco end-user lease satellite dish equipment. Residco, a Delaware corporation, was wholly owned by Klein (vice president of EQ and managing partner of Capital Asset Partners). CFP allocated 99 percent of the income from its sale of these residual interests to CFP's 99-percent limited partner, the Iowa Tribe. Residco paid the $450,000 sale price for these residual interests by issuing its $450,000 secured promissory note due January 1, 1995. Residco's note was secured by the rental payments Residco would be entitled to receive under its master lease residual interests with respect to the K-Mart and Amoco

equipment. CFP used the $450,000 Residco note to reduce its promissory note obligation to ERA (that was incurred above in step 2).

9. On January 3, 1995, in a purported section 351 nonrecognition transaction, CFP transferred to CFX Financial Services, Inc. (CFX Financial), a subsidiary of CFX: (1) CFP's remaining master lease residual interests with respect to the K-Mart, Shared, and other equipment (i.e., its master lease residual interests in that equipment, less the first 2 years of the master lease residual interest in the K-Mart equipment and the first 6 months of the master lease residual interest in the Amoco equipment that were sold to Residco as described above in step 8); (2) CFP's master lease rental payment obligation to EQ; (3) the right to receive offsetting payments from EQ under the $14.125 million EQ equipment purchase installment note; and (4) the $747,910 EQ short-term promissory note. In exchange for CFP's transfer, it received 75,000 shares of CFX Financial $1 par value preferred stock. On that same date, CFX contributed $2.8 million to CFX Financial and received 280 shares of CFX Financial common stock. (The assignment and assumption agreement between CFP and CFX Financial dated January 3, 1995, notes that the master lease equipment was subject to CLI's lien under the

$2,307,500 ERA note and ERA's lien under the $15.05 million CFP note, and that $2,782,700 was the remaining balance owed on the $15.05 million CFP note as of January 4, 1995.)[6]

After the January 3, 1995, transaction, CFX Financial made master lease rental payments to EQ in amounts equal to EQ's installment payments to CFX Financial under the $14.125 million EQ installment note.  Pursuant to the January 3, 1995, transaction, CFX claimed substantial tax benefits far greater than its economic investment in the first lease strip deal. Specifically, CFX Financial (which joined in consolidated income tax returns filed by CFX and its other affiliates, including CFX Bank) was in a position over the life of the master lease to (1) receive fully offsetting payments under the EQ installment note equal to CFX Financial's master lease rental payments and only recognizing for tax purposes the relatively smaller installment note interest income, but (2) claiming substantially larger deductions for all its master lease rental payments.

All of the transactions described in steps 1 through 8 above were structured and undertaken to benefit CFX as the first lease strip deal's ultimate customer.  CMACM received a $611,665 fee for providing advice relating to the above-described

---

[6]As noted above in steps 1 and 2, both the $2,307,500 Equity Resource Acquisition II (ERA) note to Computer Leasing, Inc. (CLI), and the $15.05 million Capital Finance Partners (CFP) note to ERA were payable within 60 days of Nov. 1, 1994.

transactions.  On April 28, 2000, CFX Financial redeemed its preferred stock held by CFP for $94,950.82, consisting of $75,000 for the shares and $19,950.82 in dividends thereon.

C.  Second Lease Strip Deal

Sometime before August 1995, Crispin asked Klein and certain parties and/or entities involved in the first lease strip deal to create another position out of the equipment package involved in that first deal.  Although petitioner and Crispin were planning to market this second lease strip deal to a customer, they changed their plans following the Internal Revenue Service's (IRS) issuance of Notice 95-53, 1995-2 C.B. 334, on October 30, 1995.  In Notice 95-53, supra, the IRS warned it would challenge and disallow potential tax benefits that taxpayers claimed under lease strip deals.  Due to the issuance of Notice 95-53, supra, petitioner and Crispin concluded that it would not be possible to sell the second lease strip deal to third parties.  Because the transactions for the contemplated deal had already been consummated, petitioner and Crispin instead decided to complete the second lease strip deal with petitioner as the "customer" or ultimate beneficiary.

The wraparound lease (over lease) in the second lease strip deal involved the K-Mart and Shared end-user lease equipment and encompassed the existing K-Mart and Shared end-user leases. However, the express lease term for the K-Mart and Shared over

lease agreement provided for no actual over lease residual interests in that equipment. The over lease agreement set forth a lease term for the K-Mart and Shared equipment that expired on the same dates as the master lease respecting that equipment.[7]

Unlike the ultimate beneficiary in the first lease strip deal, petitioner did not retain its lease position throughout the life of the over lease in the second lease strip deal. Instead, petitioner disposed of its lease position and/or the associated equipment installment note in three transactions with other entities over a 21-month period running from November 27, 1995, through September 1, 1997.

As to the second lease strip deal, the following complex series of multiparty equipment purchase, lease, and other transactions took place on August 31, September 1, September 28, and November 27, 1995; and on October 31, 1996, and September 1, 1997.

---

[7]As discussed supra, the master lease ran: (1) From Nov. 1, 1994, through Oct. 31, 2002, in the case of the K-Mart Corp. (K-Mart) end-user lease equipment, and (2) from Nov. 1, 1994, through Apr. 30, 2000, in the case of the Shared Medical System Corp. (Shared) end-user lease equipment. As discussed more fully infra, the Aug. 31, 1995, over lease agreement provided that the over lease ran: (1) From Aug. 31, 1995, through Oct. 31, 2002, in the case of the K-Mart end-user lease equipment, and (2) from Aug. 31, 1995, through Apr. 30, 2000, in the case of the Shared end-user lease equipment. Accordingly, petitioner had no residual lease interests in that equipment.

1.  On August 31, 1995, EQ sold to Capital Asset Partners (CAP), a Nevada limited partnership, the K-Mart and Shared end-user lease equipment and the right to receive master lease rents upon that equipment.  CAP assumed EQ's obligation to make related installment payments to CFX Financial under the EQ equipment purchase installment note (which EQ had issued in connection with step 3 of the first lease strip deal).  Conversely, EQ assigned to CAP the right to receive from CFX Financial the master lease rental payments relating to the K-Mart and Shared end-user lease equipment.  Those rental payments equaled and coincided with the installments due under the EQ installment note.  As a part of the foregoing sale of the K-Mart and Shared equipment, Klein (CAP's 1-percent managing general partner) executed and issued to EQ on August 31, 1995, CAP's $750,000 secured promissory note, due November 29, 1995.

Kanawha Enterprises, LP (Kanawha), a Nevada limited partnership, was CAP's 99-percent limited partner.  The Iowa Tribe was the 99-percent limited partner of Kanawha, and a company named Pending One was the .9-percent managing general partner of Kanawha, with the remaining .1-percent interest in Kanawha held by Z-Kelp, LP, a limited partnership.  Mallin was Pending One's president.  For purposes of the second lease strip

deal, the Iowa Tribe had the same role, involvement, and participation in Kanawha as the Iowa Tribe had in CFP for purposes of the first lease strip deal.

2.   On August 31, 1995, CAP transferred ownership of the K-Mart and Shared end-user lease equipment, along with the right to receive master lease rental payments upon that equipment, to Jenrich Corp. (Jenrich) in exchange for two notes.[8]  One Jenrich note was a $4,056,220 long-term nonrecourse secured installment note with 8 percent interest payable in:

> (i) thirteen (13) semi-annual installments of principal and interest, each in the amount of $371,301 payable on February 28th and August 30th of each year, commencing on February 28, 1996 through and including February 28, 2002, and (ii) four (4) semi-annual installments of principal and interest, each in the amount of $159,876 payable on August 30th and February 28th of each year, commencing August 30, 2002, through and including February 28, 2004.

The other Jenrich note was a $215,000 short-term note due November 29, 1995.  Both notes were signed by Marlene Freedman (Freedman), Jenrich's sole shareholder and president.

----

[8]For its taxable years ended Mar. 31, 1995 and 1996, Jenrich Corp. (Jenrich) claimed losses of $4,879,471 and $16,203,523, respectively.  From its 1995 through 1997 fiscal years, Jenrich's deficit in retained earnings for financial accounting purposes also increased dramatically:  For its year ended Mar. 31, 1995, Jenrich's deficit in retained earnings increased from $24,806 to $137,303,245; for its year ended Mar. 31, 1996, Jenrich's deficit in retained earnings increased from $137,303,245 to $153,506,768; and for its year ended Mar. 31, 1997, Jenrich's deficit in retained earnings increased from $153,506,768 to $155,502,577.

Freedman was a longtime employee of Mallin and performed administrative and office work for Mallin.  During 1980, acting upon Mallin's advice, Freedman invested $2,500 to acquire Jenrich.  Mallin was instrumental in bringing about Jenrich's and Freedman's involvement in the foregoing transaction.  Mallin advised Freedman to cause Jenrich to enter into that transaction and the equipment leaseback from CAP (described below in step 3).  Mallin negotiated those transactions for Freedman with Jenrich and CAP.  Freedman discussed those transactions with Mallin, but not with Klein, the managing general partner of CAP who rented space in Mallin's office.  Freedman eventually disposed of her interest in Jenrich for $5,000 during 2000 when she sold her Jenrich stock to an associate of Mallin.  Freedman received $40,000 in compensation as an officer of Jenrich from 1993 through 2003.

3.  Also on August 31, 1995, CAP leased back from Jenrich the Shared and K-Mart equipment pursuant to the over lease wraparound lease covering the existing K-Mart and Shared end-user leases and the master lease for the K-Mart and Shared end-user lease equipment.  In exchange, CAP received the right to CFX Financial's master lease rental payments on that equipment.  The over lease agreement provided for lease periods of the K-Mart and Shared end-user lease equipment that coincided with and ended at the same times as the master lease for the K-Mart and Shared

equipment. With those lease periods specified by the over lease agreement, CAP would have no actual over lease residual interests in the K-Mart and Shared equipment. See supra note 7.

The right to the master lease rental payments owed by CFX Financial for the K-Mart and Shared equipment was separate from the over lease rental payments that CAP owed to Jenrich. Under the over lease, CAP was obligated to apply those CFX Financial master lease rental payments to pay off the EQ installment note held by CFX Financial. As to CAP's over lease rental payments due to Jenrich, they equaled and coincided with the installments that Jenrich was required to make to CAP under Jenrich's $4,056,220 equipment purchase installment note (which had been issued in connection with the above CAP-Jenrich transaction in step 2).

4. On the next day, September 1, 1995, CAP sold to Aardan Leasing Corp. (Aardan), a Delaware corporation, the rights to the master lease rental payments due from CFX Financial relating to the K-Mart and Shared equipment. The September 1, 1995, agreement between CAP and Aardan provided that Aardan assume CAP's obligation (described above in step 1) to CFX Financial under the EQ installment note.

Virtually all of CAP's income from the sale to Aardan was allocated to Kanawha (CAP's 99-percent limited partner) and in turn to the Iowa Tribe. Although not directly a partner of CAP, the Iowa Tribe was the 99-percent limited partner of Kanawha.

Aardan was organized by Mallin before 1995. Roland Hennessey (Hennessey), who was also an officer of Jenrich, signed the September 1, 1995, sales agreement on behalf of Aardan. At Mallin's request, Hennessey, beginning in 1986 or 1987, served as an officer of several corporations (including Aardan and Jenrich) and at some unspecified point, eventually was designated as Aardan's owner. Hennessey had retired as a police officer before his involvement in these transactions. In exchange for Hennessey's serving as an officer and/or owner of these various corporations, Mallin paid Hennessey $1,000 per month. Hennessey's role in these corporations was that of a nominee who signed documents. Hennessey had no involvement in negotiations, decisionmaking, or business activities of the corporate entities.

5. Pursuant to a September 28, 1995, document, CAP, in exchange for 10 shares of CMACM common stock in a purported section 351 transaction, transferred, among other things, the following to CMACM: (1) CAP's rights under the over lease; (2) the $4,056,220 Jenrich equipment purchase installment note; (3) CAP's over lease rental payment obligation to Jenrich; and (4) $215,000 of CAP's obligation to EQ under the $750,000 CAP

equipment purchase note.  On that same date, CMA contributed $68,000 to CMACM in exchange for 68,000 shares of CMACM common stock.

For tax purposes, CMACM claimed a $4,081,319 carryover basis in the Jenrich note, consisting of the note's $4,056,220 face value and accrued interest of $25,099.  By means of a March 25, 1996, letter agreement, CMACM and Jenrich agreed to offset CMACM's over lease rental payment liability and Jenrich's installment note liability against one another so that no cash payments would have to be made by CMACM or Jenrich.

6.  On November 27, 1995, CMACM transferred all of its interests and obligations under various agreements relating to the K-Mart end-user lease equipment to Okoma Enterprises, LP (Okoma), a Delaware limited partnership.  Among other things, CMACM transferred the following to Okoma:  (1) CMACM's over lease rights in the K-Mart equipment, and (2) a portion of the Jenrich note in the amount of $1,982,185.  In exchange, Okoma assumed CMACM's over lease obligations concerning the K-Mart end-user lease equipment and also CMACM's obligations on the CAP note in the amount of $235,000.  Okoma's 99-percent limited partner was the Iowa Tribe and Okoma's 1-percent managing general partner was MBP Administration, Inc., a Nevada corporation.  On its 1995 Federal return, petitioner characterized CMACM's partial disposition of the Jenrich note as a "rental expense" of

$1,982,825. The $1,982,825 rental deduction, in conjunction with other items on petitioner's 1995 Federal return, resulted in a $404,000 net operating loss (NOL) carryover from the 1995 to the 1996 tax year. Respondent, in the notice of deficiency, disallowed the $404,000 NOL carryover.

7. On October 31, 1996, CMACM transferred 25 percent of its interests and obligations in the Shared end-user lease to First Lexington Leasing, Inc. (Lexington). From 1998 to the time of trial Lexington was owned by Asset Leasing Partners I, LP, with Crispin and CMACM as managing general partners and the Iowa Tribe as a limited partner. Among other things, CMACM transferred: (1) Twenty-five percent of CMACM's rights in the Shared equipment, and (2) 25 percent of that portion of the Jenrich note attributable to the Shared equipment. In exchange for CMACM's transfer, Lexington issued a $10,000 unsecured promissory note to CMACM and assumed 25 percent of that portion of CMACM's over lease rental payment obligation to Jenrich attributable to the Shared equipment. The promissory note had an 8-percent interest rate and was due on December 31, 2002.

Lexington was incorporated in California during 1995 and was wholly owned by Richard Koehler (Koehler), a friend and longtime business associate of Crispin. Before and after the CMACM-Lexington transaction, Koehler depended on petitioner and Crispin for funds to keep CMA Capital Corp. operating.

For 1996, CMACM claimed a $469,221 cost basis in its 25-percent portion of the Jenrich note transferred to Lexington. In addition, CMACM claimed a $459,221 loss from its partial disposition of that note. CMACM also deducted $414,041 for the over lease rental payments that it reported as being paid to Jenrich during 1996. The $414,041 amount equaled the amount due CMACM from Jenrich under the Jenrich installment note.

8. On September 1, 1997, CMACM transferred to Lexington the remaining 75 percent of its interests and obligations under various agreements concerning the Shared end-user lease equipment. Among other things, CMACM transferred: (1) The remaining 75 percent of CMACM's over lease rights in the Shared equipment, and (2) 75 percent of that portion of the Jenrich note attributable to the Shared equipment. In exchange for CMACM's transfer, Lexington issued its $1,000 unsecured promissory note to CMACM and assumed 75 percent of that portion of CMACM's over lease rental payment obligation to Jenrich attributable to the Shared equipment. Pursuant to the terms of the unsecured note, Lexington promised to pay CMACM $1,000, plus 8 percent interest on December 31, 2002.

For 1997, CMACM claimed a $1,179,013 basis in the 75-percent portion of the Jenrich note it transferred to Lexington and a $1,178,013 loss from the partial disposition of the note. CMACM

also deducted $237,853 (which was equal to the amount due CMACM from Jenrich under the Jenrich installment note) as over lease rental payments that it claimed to have paid to Jenrich during 1997.

D. Other Aspects of Petitioner's Claimed Losses and Deductions With Respect to the Second Lease Strip Deal

As a result of the second lease strip deal and CMACM's partial dispositions of the Jenrich note over a 21-month period, petitioner claimed more than $4.2 million of deductions for 1995, 1996, and 1997. Petitioner did not report any income from Okoma's and Lexington's assumptions of CMACM's over lease rental payment obligations to Jenrich. In addition to $3,620,059 of losses claimed for dispositions of the Jenrich note, petitioner claimed deductions of $414,041 (1996) and $237,853 (1997) for over lease rental payments to Jenrich. In almost all of the above-described second lease strip deal transactions, petitioner either received or was entitled to receive an offsetting payment equal to the amount it was obligated to pay and deducted. In only one instance, involving the purported section 351 transfer, did petitioner assume $215,000 of the $750,000 CAP note owed to EQ, without receiving or being entitled to receive an equivalent offsetting amount.

On July 20, 1998, CMACM redeemed the 10 shares of CMACM common stock held by CAP for $500. On its return for its taxable year ended November 30, 1998, petitioner wrote off and deducted the $10,000 and $1,000 Lexington notes issued to CMACM in the CMACM-Lexington transactions.

In the second lease strip deal, the over lease residual interests in the K-Mart and Shared equipment were the sole source of possible cashflow and pretax profit to petitioner. About 2 months after CMACM obtained the over lease residual interests from CAP, CMACM transferred the over lease residual interest in the K-Mart equipment to Okoma. On October 31, 1996, CMACM transferred 25 percent of its over lease residual interest in the Shared equipment to Lexington. As previously noted, upon termination of the Shared end-user lease (March 29, 1997), the Shared equipment was to be returned to CLI. On September 1, 1997, CMACM transferred the remaining 75 percent of its over lease residual interest in the Shared equipment to Lexington. For 1998, petitioner wrote off the $10,000 and $1,000 Lexington notes that CMACM earlier received in exchange for CMACM's residual lease interest in the Shared equipment. Christopher Hughes (Hughes), petitioner's manager for tax and accounting, concluded, among other things, that Lexington's lease position in the Shared equipment was worthless.

In connection with its involvement in the second lease strip deal, petitioner did not obtain an outside appraisal as to the value of the over lease residual interests in the K-Mart and Shared equipment or tax advice regarding that deal from an independent, qualified tax adviser. Crispin and Hughes analyzed the second lease strip deal, and Hughes prepared an analysis of the value of the over lease residual interests before CMACM's entering into its transaction with CAP. Hughes, in valuing the over lease residual interests, considered an earlier appraisal report (the Marshall & Stevens appraisal) on the master lease residual interests in the K-Mart, Shared, and other equipment that was done by Ralph Page of the firm of Marshall & Stevens and furnished it to CFX.

Late in 1994 and in early 1995, petitioner, Crispin, and others obtained and used the following items in the marketing of the first lease strip deal to CFX: (1) The Marshall & Stevens appraisal; (2) another similar appraisal report on the master lease residual interests done by the firm of Murray, Devine & Co. that was also furnished to CFX (the Murray, Devine appraisal); and (3) the tax opinion issued to CFX by the law firm Thacher Proffitt & Wood, as CFP's counsel (the Thacher Proffitt tax opinion). Petitioner and Crispin were familiar with the IRS's October 30, 1995, issuance of Notice 95-53, 1995-2 C.B. 334, warning that the Commissioner would challenge and disallow on

various grounds the tax benefits that taxpayers claimed under lease strip deals.  Until the issuance of Notice 95-53, supra, petitioner and Crispin were contemplating the marketing of the second lease strip deal.  Following Notice 95-53, supra, Crispin concluded it would not be possible to sell that second deal to a third party, and instead decided to have petitioner become the customer/user of the tax benefits from the second deal.

II.  Petitioner's 1995 Through 1997 Advances to Cap Corp. and the December 2, 1996, Debt Conversion Transaction

A.  Cap Corp. and Its Business

CMA Capital Corp. (Cap Corp.) was organized in 1989, and until August 1995, Crispin and Koehler were each 50-percent shareholders.  During August 1995, Crispin reduced his stock ownership from 50 percent to 9 percent, and Koehler correspondingly increased his stock ownership interest in Cap Corp. from 50 percent to 91 percent.

Through December 2, 1996, Koehler was in charge of Cap Corp.'s day-to-day operations, and he would, at least weekly, consult with Crispin about Cap Corp.  After December 2, 1996, Crispin took over Cap Corp.'s day-to-day operations.  Sometime during the middle of 1997, Koehler formally resigned his positions as a director and a manager of Cap Corp. and transferred some of his Cap Corp. stock to Crispin, making Crispin Cap Corp.'s majority shareholder.

From its inception in 1989, CMA Capital Group (Cap Group) was a wholly owned subsidiary of Cap Corp. From its inception until December 2, 1996, Crispin Koehler Securities (CKS), a securities broker-dealer, was also a wholly owned subsidiary of Cap Corp.

In 1989, Crispin and Koehler formed JetFleet Aircraft, LP (JetFleet I), a California limited partnership that invested in leased aircraft and related equipment. Crispin, Koehler, and Cap Group were general partners of JetFleet I. In 1991, Crispin and Koehler formed JetFleet Aircraft II, LP (JetFleet II), another California limited partnership that invested in leased aircraft and related equipment. Crispin, Koehler, Cap Group, and CMA Capital Group LP were general partners of JetFleet II. CMA Capital Group LP[9] was a California limited partnership that was formed in 1992. Crispin and Koehler were general partners of CMA Capital Group LP and PSC Aircraft Leasing was a limited partner of CMA Capital Group LP. CMA Capital Group LP was dissolved on May 31, 1994.

The main business location and/or the administrative and support functions of Cap Corp., Cap Group, CKS, and the JetFleet I and JetFleet II partnerships were at petitioner's office in Burlingame, California. Cap Corp. and its two subsidiaries, Cap

---

[9]Not to be confused with CMA Capital Group (Cap Group), the CMA Capital Corp. (Cap Corp.) subsidiary formed in 1989.

Group and CKS, derived substantial fees and other income in connection with the JetFleet I and JetFleet II partnerships. Cap Group's original business goal was to arrange for the syndication and marketing to investors of the JetFleet I and JetFleet II partnerships. Cap Group was to act as sponsor and managing general partner of the JetFleet I and JetFleet II partnerships. It leased and managed the aircraft equipment on behalf of each partnership and its investor-partners. In exchange for Cap Group's services it was to receive fees and a percentage of each partnership's cashflow. Up until approximately 1994, CKS marketed interests in the JetFleet I and JetFleet II partnerships to investors.

From approximately 1994 through 1997, the JetFleet I and JetFleet II partnerships were not being marketed while Crispin and others considered plans and undertook steps for consolidating those two partnerships into a publicly held corporation. As of December 1996, Cap Corp. and the management of the JetFleet I and JetFleet II partnerships were making progress towards obtaining consents from over 90 percent of the investor-partners in each partnership to effect the consolidation of those two partnerships into a new publicly traded corporation. At that time, however, ultimate approval of the proposed consolidation of those two partnerships was by no means certain. It was not until November 1997 that the votes respecting the proposed consolidation were

tallied and the consolidation was approved by the requisite percentage of the investor-partners in each partnership. Shortly thereafter, the two partnerships were consolidated into a company named AeroCentury. As a result of the consolidation, Cap Corp. received 44,119 shares of AeroCentury stock. On January 1, 1998, it transferred the 44,119 AeroCentury shares to petitioner in part payment of its outstanding debts to petitioner.

During 1995, Cap Corp. and CKS began marketing to investors JetFleet III, a third aircraft equipment leasing partnership. From 1995 through 1997, Cap Corp. was insolvent. Crispin dissolved Cap Corp. during 1999. Cap Corp. would have failed long before 1999 without the advances it received from petitioner during the period 1995 through 1997.

B. Petitioner's 1995 and 1996 Advances to Cap Corp.

During petitioner's taxable years ended November 30, 1996 and 1997, Cap Corp. was unable to pay its expenses from its revenues and the revenues of Cap Group and CKS, its two wholly owned subsidiaries. Earlier, Cap Corp. raised capital by issuing more than $4 million of its notes to third parties. During 1996, approximately $2.5 million of these notes remained outstanding. Although the principal payments were not due until December 1997 or December 1998, Cap Corp. was obligated to make interest payments. Cap Corp. also had obligations to pay its expenses and those of its subsidiaries. Among other things, CKS (the

securities dealer) incurred considerable monthly overhead and marketing expenses. From 1994 through 1996, CKS had 10 to 15 branch offices around the country and over 150 employees, including a large sales staff. In addition to marketing the JetFleet I, JetFleet II, JetFleet III, and other securities products, CKS's business also included the marketing of bonds.

Crispin was aware of Cap Corp.'s inability to pay its expenses and Cap Corp.'s need for advances to pay those expenses. Koehler asked Crispin to supply operating capital for Cap Corp. Crispin arranged for petitioner to advance funds to Cap Corp. to pay its day-to-day operating expenses. Through January 1, 1995, petitioner advanced $858,991 to Cap Corp.[10] On April 30, June 30, and August 31, 1995, Cap Corp. made payments to petitioner totaling $593,834, leaving a $515,825 balance as of August 31, 1995. From September 1995 through November 30, 1996, petitioner advanced an additional $2,060,425 to Cap Corp. without considering accrued interest. As of November 30, 1996, Cap Corp. owed petitioner $2,759,903.

Cap Corp. issued a January 1, 1995, promissory note to petitioner concerning the January 1, 1995, through November 30, 1996, advances. This promissory note in pertinent part stated:

---

[10]Except as where otherwise indicated, for convenience these amounts in controversy that petitioner advanced have been rounded to the nearest $1.

FOR VALUE RECEIVED, * * * [Cap Corp.], hereby promises to pay on or before November 30, 1996 to the order of * * * [petitioner] all principal and interest outstanding according to the attached Schedule A under this note.

1. This note (the "Note") shall bear interest from the date hereof on the principal amount of the Note outstanding from time to time, at the rate per annum (on the basis of a 365-day year for the actual number of days involved) of 10%.

2. This Note shall be governed by and constructed in accordance with the laws of the State of California.

Sometime on or after November 30, 1996, Koehler signed a document entitled "Schedule A" acknowledging that petitioner had transferred funds to Cap Corp. that it was to repay. The Schedule A contained the following:

| Date | Loans | Interest Accrued | Principal Balance | Interest Balance | Total Balance |
|------|-------|------------------|-------------------|------------------|---------------|
| 1-1-95 | -- | -- | $858,990.87 | -- | $858,990.87 |
| 1-31-95 | -- | $7,295.54 | 858,990.87 | $7,295.54 | 866,286.41 |
| 2-28-95 | -- | 6,824.86 | 858.990.87 | 14,120.40 | 873,111.27 |
| 3-31-95 | -- | 7,530.88 | 858,990.87 | 21,651.28 | 880,642.15 |
| 4-30-95 | ($360,000.00) | 7,295.54 | 498,990.87 | 28,946.82 | 527,937.69 |
| 5-31-95 | 196,425.65 | 4,374.71 | 695,416.52 | 33,321.53 | 728,738.05 |
| 6-30-95 | (136,412.00) | 5,906.28 | 559,004.52 | 39,227.81 | 598,232.33 |
| 7-31-95 | 5,168.00 | 4,900.86 | 564,172.52 | 44,128.67 | 608,301.19 |
| 8-31-95 | (97,422.00) | 4,946.17 | 466,750.52 | 49,074.84 | 515,825.36 |
| 9-30-95 | 174,405.00 | 3,964.18 | 641,155.52 | 53,039.02 | 694,194.54 |
| 10-31-95 | 150,000.00 | 5,621.09 | 791,155.52 | 58,660.11 | 849,815.63 |
| 11-30-95 | 289,436.76 | 6,719.40 | 1,080,592.28 | 65,379.51 | 1,145,971.79 |
| 12-31-95 | 40,000.00 | 9,473.69 | 1,120,592.28 | 74,853.20 | 1,195,445.48 |
| 1-31-96 | 135,000.00 | 9,824.37 | 1,255,592.28 | 84,677.57 | 1,340,269.85 |
| 2-29-96 | 86,000.00 | 10,319.94 | 1,341,592.28 | 94,977.51 | 1,436,589.79 |
| 3-31-96 | 40,000.00 | 11,761.90 | 1,381,592.28 | 106,759.41 | 1,488,351.69 |
| 4-30-96 | 169,000.00 | 11,734.07 | 1,550,592.28 | 118,493.48 | 1,669,085.76 |
| 5-31-96 | 72,000.00 | 13,594.23 | 1,622,592.28 | 132,087.72 | 1,754,680.00 |
| 6-30-96 | 141,100.00 | 13,780.92 | 1,763,692.28 | 145,868.64 | 1,909,560.92 |
| 7-31-96 | 181,000.00 | 15,462.51 | 1,944.692.28 | 161,331.15 | 2,106,023.43 |
| 8-31-96 | -- | 17,049.36 | 1,944,692.28 | 178,380.50 | 2,123,072.78 |
| 9-30-96 | 138,926.00 | 16,516.56 | 2,083,618.28 | 194,897.07 | 2,278,515.35 |
| 10-31-96 | 208,000.00 | 18,267.34 | 2,291,618.28 | 213,164.41 | 2,504,782.69 |
| 11-30-96 | 235,657.46 | 19,463.06 | 2,527,275.74 | 232,627.46 | 2,759,903.20 |

C.  The December 2, 1996, Debt Conversion Transaction

By October 1996, Crispin and Koehler realized that Cap Corp. was insolvent with obligations that were several multiples of its assets.  They also realized that Cap Corp.'s poor financial condition was negatively affecting CKS's operations.  Hence, they formulated a debt conversion transaction whereby:  (1) Crispin and Koehler would establish a new corporation; (2) that new corporation would assume substantially all of Cap Corp.'s outstanding debt to petitioner, in exchange for receiving Cap Corp.'s 100-percent stock ownership interest in CKS; and (3) petitioner would cancel all but $100,000 of the Cap Corp. debt assumed by the new corporation, in exchange for a preferred stock in the new corporation.

On or about October 22, 1996, Crispin and Koehler incorporated Crispin Koehler Holding Corp. (CKH), a California corporation.  Crispin's and Koehler's respective stock ownership interests in CKH were the same as their then-respective stock ownership interests in Cap Corp.--9 percent for Crispin and 91 percent for Koehler.  CKH's place of business was the same as petitioner's.

On December 2, 1996, Cap Corp., CKH, CKS, and petitioner effected a debt conversion transaction relieving Cap Corp. of $2.259 million of its debt to petitioner.  This debt relief for Cap Corp. was accomplished through the following two steps:  (1)

Cap Corp. (through Koehler), CKH (through Koehler), CKS (through Koehler), and petitioner (through Crispin) executed a December 2, 1996, stock purchase agreement under which CKH assumed $2.259 million Cap Corp. debt in exchange for 100 percent of the outstanding stock of CKS (503,820 shares); and (2) CKH (through Koehler) and petitioner (through Crispin) entered into a December 2, 1996, "Debt Conversion Agreement", under which they agreed that CKH would issue to petitioner 215,990 shares of CKH $10 preferred stock in exchange for petitioner's cancellation of all but $100,000 of the $2.259 million Cap Corp. debt assumed by CKH. CKH paid the $100,000 of the Cap Corp. debt by offsetting it against a $100,000 receivable due to CKH from petitioner.

CKS (which CKH was acquiring from Cap Corp.) was worth far less than $2.259 million as of December 2, 1996. Crispin and Koehler estimated that CKH's net asset value (excluding CKS's indeterminate and highly speculative value) did not exceed $100,000 after the debt conversion transaction.[11]

---

[11]As will be discussed more fully infra in connection with the National Service Industries (NSI) consulting fee issue, at the time Crispin Koehler Holding Corp. (CKH) was created in October 1996, NSI was negotiating with petitioner for petitioner's help in arranging an NSI subsidiary's divestment of a "tax benefit transfer lease" without adverse tax consequences. To effect such a divestment, it would be necessary for petitioner to use a securities broker-dealer like Crispin Koehler Securities (CKS). On Dec. 1, 1996, NSI and petitioner executed a consulting agreement whereby petitioner would be paid a $2.5 million consulting fee for its services in arranging such a divestment. Petitioner contends that it and CKH had previously reached an

(continued...)

After the debt conversion, Cap Corp. remained liable to petitioner for $500,000 of the original $2.7599 million debt. On its 1996 Federal return, Cap Corp. did not report cancellation of indebtedness income from the debt conversion transaction.

D. Petitioner's 1997 Advances to Cap Corp.

After December 2, 1996, Crispin took over the management of Cap Corp., Cap Group (Cap Corp.'s subsidiary), and the consolidation activity with respect to the JetFleet I and JetFleet II partnerships. Shortly after the December 2, 1996, debt conversion transaction, Koehler no longer managed Cap Corp. Koehler continued to manage CKS, Cap Corp.'s former subsidiary that became a wholly owned subsidiary of CKH in the debt conversion. Sometime during the summer of 1997, Koehler formally resigned his positions as a director and manager of Cap Corp., and he transferred some of his Cap Corp. stock to Crispin, making Crispin the majority shareholder of Cap Corp.

Although Crispin knew that Cap Corp. continued to be insolvent after the debt conversion transaction, he caused petitioner to transfer additional funds to Cap Corp. during 1997.

---

[11](...continued)
oral agreement that CKH would receive a $2 million portion of any NSI consulting fee. Petitioner further maintains that, as of the Dec. 2, 1996, date of the debt conversion, consummation of the desired divestment (and NSI's payment of a consulting fee to petitioner) was still uncertain and could have fallen through. Petitioner argues that, at that time, petitioner's receipt of an NSI consulting fee was not even a "bird in the bush".

The financial statement that was part of Cap Corp.'s 1996 Federal return reflects that Cap Corp.'s assets were just under $151,000 and its liabilities were well over $4 million. Cap Corp.'s 1996 return also reflected a net loss of $641,600 for Cap Corp. and its subsidiaries. As of November 30, 1997, Cap Corp. owed petitioner $1,859,135, consisting of the $500,000 outstanding debt along with $1.257 million of additional advances made during 1997, plus interest. During 1997, petitioner made advances to Cap Corp. of $55,000 on January 31, 1997; $50,000 on April 30, 1997; and $1.152 million on July 31, 1997.

Cap Corp. (through Koehler) issued petitioner a December 1, 1996, promissory note to cover the above debt. Among other things, Cap Corp. promised to pay on or before November 30, 1997, all outstanding principal and 10 percent interest to petitioner.

E. Petitioner's 1997 Ordinary Loss and Bad Debt Deduction; Petitioner's 1998 AeroCentury Stock Transaction

On its 1997 return, petitioner claimed a $1,859,135 bad debt deduction consisting of: (1) The $500,000 Cap Corp. debt not assumed by CKH in the debt conversion transaction; (2) the $1,257,000 of advances to Cap Corp. during 1997; and (3) $102,135 of interest owed petitioner by Cap Corp. Petitioner did not claim a deduction with respect to CKH's $2.259 million assumption of Cap Corp.'s debt or the conversion of the Cap Corp. debt into

CKH preferred stock.  On its 1998 return, petitioner reported $441,190 of miscellaneous income in connection with its receipt of 44,119 shares of AeroCentury stock from Cap Corp.

On February 15, 2001, during respondent's examination of the 1997 tax return, petitioner submitted an informal claim asserting that it was entitled to an additional ordinary loss deduction in an amount exceeding $2 million in connection with the debt conversion transaction.  In its informal claim, petitioner asserted:  (1) CKH's only valuable asset was CKS; and (2) since CKS's filing for bankruptcy under chapter 7 of the Bankruptcy Code in 1998, CKS has been in the process of liquidation.  Petitioner also maintained that ignoring the speculative goodwill attributable to CKS, CKH had a net worth of approximately $120,000 after the debt conversion transaction.

In the notice of deficiency for 1997, respondent disallowed the additional ordinary loss informally claimed and the $1,859,135 bad debt deduction.  Among other things, respondent determined:  (1) The claimed ordinary loss and bad debt deduction were not allowable because they represented capital expenditures; and (2) it had not been established that petitioner's reported $1,859,135 bad debt became worthless during 1997.

In its petition, petitioner claimed a $2,052,900 ordinary loss regarding CKH's assumption of Cap Corp.'s $2.259 million debt to petitioner and/or petitioner's cancellation of that debt

in exchange for CKH preferred stock.  Petitioner contended that the value of the CKH preferred stock would not have exceeded $207,000 at the time of the exchange.

### 1.  The $2 Million Consulting Fee

Before the creation of CKH in October 1996, petitioner was negotiating with National Service Industries, Inc. (NSI), to provide certain services.  The services involved assisting NSI to dispose of a safe harbor lease under former section 168(f)(8) without adverse tax consequences.  The safe harbor lease was on the verge of producing approximately $87 million of ordinary income (the tax benefit lease).  Although NSI, if it remained the holder of the tax benefit lease, would not receive or be enriched by $87 million from an economic standpoint, NSI, for tax purposes, would be obligated to report $87 million of ordinary income with respect to the tax benefit lease.  A consulting agreement was executed between NSI Enterprises (an NSI subsidiary) and petitioner on December 1, 1996, 1 day before Cap Corp.'s, CKH's, and petitioner's execution of the stock purchase and debt conversion agreements, discussed in II. C. above, under which among other things, CKH acquired a 100-percent stock ownership in CKS.

NSI intended to divest itself of the lease without adverse tax consequences.  To that end, in August 1996 NSI entered into a presumably tax-free, nonrecognition transaction involving preferred stock in a company called RD Leasing (RD).[12]  The RD stock had a value of approximately $700,000.  Significantly, the prior owner of the RD stock ostensibly had a high tax basis (approximately $87 million) in the stock.[13]  By acquiring the RD stock in a presumably tax-free transaction, NSI sought to obtain an $87 million carryover basis and a potential built-in loss of nearly $87 million to offset $87 million of ordinary income from the tax benefit lease.  NSI's plan was to transfer the tax benefit lease and the RD stock to an NSI affiliate in a series of tax-free transactions.  NSI would then sell, to an unrelated entity, all outstanding shares of stock in the NSI affiliate with the offsetting income and loss.  The unrelated entity could sell the RD stock to trigger the $87 million built-in loss.  To be entitled to offset and to claim an ordinary loss with respect to

---

[12]The bona fides and proper attendant tax consequences of the divestment and/or any of the divestment's steps to NSI and/or other participants are not in issue in this case.

[13]This prior owner's earlier acquisition of the RD Leasing (RD) preferred stock was discussed in Andantech L.L.C. v. Commissioner, T.C. Memo. 2002-97, affd. on some issues and remanded for further proceedings on other issues 331 F.3d 972 (D.C. Cir. 2003).

the sale of the RD stock, the unrelated entity, however, would have to be a securities dealer in whose hands the preferred stock would be "inventory" rather than a capital asset.[14]

NSI paid a $2.5 million fee to petitioner in late January 1997 for services in helping to arrange the divestment. Melissa Meder (Meder), NSI's vice president for tax, was involved in planning and effecting NSI's divestment of the tax benefit lease. On August 31, 1996, NSI, through a subsidiary, acquired the RD stock[15] in exchange for 7,302 shares of NSI Enterprises preferred stock. The RD stock had a $100 per share liquidation preference value, was entitled to a dividend of 6.878 percent per annum, and had a "put" feature allowing the preferred stockholder to request redemption and to have that stock redeemed on or after January 1, 1999. While the preferred stock remained outstanding, RD was required to maintain investments in governmental instruments or "A"-rated bonds having a value equal to the preferred stock's liquidation preference and accrued but unpaid dividends.

On August 31, 1996, NSI transferred to NSI Enterprises the tax benefit lease and certain real estate in Decatur, Georgia (the Decatur realty). On the same date, NSI Enterprises transferred to Corisma, Inc. (Corisma), a wholly owned subsidiary

---

[14]See sec. 1221(1); see also sec. 1211(a), which prohibits a corporate taxpayer's deduction of a capital loss against its ordinary income.

[15]RD was a second-tier subsidiary of Norwest Bank (Norwest).

of NSI Enterprises, the tax benefit lease, the RD stock, and the Decatur realty.  Before August 31, 1996, Corisma had been an inactive subsidiary of NSI Enterprises.  Concurrently with the conveyance of the Decatur realty to Corisma on August 31, 1996, NSI leased back the Decatur realty from Corisma under a net lease agreement for use by NSI's Lithonia division.

Beginning in the fall of 1996 through December 1, 1996, Meder (on NSI's behalf) sought petitioner's services in finding a buyer for Corisma and helping NSI to consummate a sale of Corisma's shares to that buyer.  On December 1, 1996, petitioner and NSI Enterprises executed a consulting agreement pursuant to which petitioner ostensibly would provide consulting services to NSI Enterprises and its corporate affiliates for a 3-year period ending November 30, 1999, in exchange for the $2.5 million fee, payable "in advance" (December 1, 1996) at the inception of the NSI Enterprises-petitioner consulting agreement.

As of the conclusion of the December 2, 1996, debt conversion transaction, aside from CKH's 100-percent stock ownership interest in CKS, CKH did not have any significant assets.  Koehler held 91 percent of CKH's outstanding common stock and Crispin held the remaining 9 percent.  Petitioner held a large preferred stock interest in CKH.  Koehler estimated that petitioner's CKH preferred stock represented 98 percent of the

total equity in CKH.  Among other things, petitioner's ownership of the CKH preferred stock gave petitioner a liquidation preference upon CKH's liquidation.

After December 1, 1996, petitioner offered CKH as a prospective buyer for Corisma and negotiated with NSI the terms of CKH's purchase of Corisma.  Immediately before selling Corisma to CKH, NSI changed Corisma's name to LLDEC, Inc. (LLDEC).  CKH employees did not participate in the negotiations for purchase of LLDEC (Corisma); petitioner alone conducted the negotiations. Meder was unaware that CKH was to be LLDEC's  buyer until the final stages of the transaction.  Meder learned that CKH would be the prospective buyer probably no earlier than January 29, 1997, when Koehler issued a document authorizing CKH to purchase LLDEC's stock from NSI Enterprises.

On January 30, 1997, Earl Lester (Lester) on CKH's behalf executed the closing documents for purchase from NSI of the LLDEC stock and LLDEC's sale of the Decatur realty to Wachovia Capital Markets, Inc. (Wachovia).  Lester worked as a salesman for CKS in Lexington, Kentucky, primarily selling Jet Fleet partnership interests.  Koehler asked Lester to travel to Atlanta to sign the closing documents.  Lester was appointed an officer of CKH on the same day that he executed these documents for CKH.  Lester was not a knowledgeable participant in the transactions and was under the impression that he was in Atlanta to sign documents for

Crispin in a "tax deal". Upon his return from Atlanta, Lester was paid about $7,500 for his services in traveling to and participating in the closing.

Although Koehler did not attend the Atlanta closing, Koehler was elected sole director, president, secretary, and treasurer of LLDEC in documents dated January 30, 1997. On January 30, 1997, Lester was elected senior vice president of LLDEC. Also by means of a January 30, 1997, document, Koehler (as LLDEC's sole director) authorized LLDEC's sale of the Decatur realty to Wachovia for $7,577,657, which was accomplished by means of a January 30, 1997, agreement between LLDEC and Wachovia. The sale of the Decatur realty to Wachovia was negotiated by employees of NSI. In a January 30, 1997, document entitled "Guaranty of Lease", NSI guaranteed fulfillment of the obligations in the prior net lease agreement (to which the Decatur realty was subject) between NSI and Corisma. Finally, on January 30, 1997, NSI sold all of LLDEC's stock to CKH for $7,053,000 derived from LLDEC's sale of the Decatur realty. LLDEC paid petitioner $524,657 (which represented the difference between the $7,577,657 selling price for the Decatur realty and the $7,053,000 selling price for the LLDEC stock), purportedly as an investment banking fee for petitioner's arranging the sale of the Decatur realty.

On January 30, 1997, NSI paid petitioner the $2.5 million fee mentioned in the December 1, 1996, consulting agreement. Although the December 1, 1996, consulting agreement stated that petitioner was to provide "consulting services" for a 3-year period ending November 30, 1999, after January 30, 1997, petitioner was not required to render any further services.

On February 1, 1997, CKS and petitioner executed an investment banking services agreement, pursuant to which petitioner agreed to provide consulting services to CKS with respect to CKS's disposition of the RD stock and the tax benefit lease. Upon CKS's disposition of the RD stock, petitioner was to receive the net proceeds, less $132,000. Upon CKS's disposition of the tax benefit lease, petitioner was to receive 75 percent of the net proceeds.

On February 4, 1997, LLDEC (now also a CKH subsidiary) transferred the tax benefit lease and the RD stock to CKS. On February 13, 1997, petitioner transferred $2 million to CKH. On May 5, 1997, Norwest (through its subsidiary Norwest Equipment) redeemed the RD stock and paid CKS $758,123.64 representing the liquidation value of the RD stock, plus accrued dividends. CKS, in turn, transferred $624,123.64 of the $758,123.64 to petitioner, leaving CKS with $134,000.[16]

_____

[16]As indicated above, the investment banking services agreement between CKS and petitioner provided that $132,000 was
(continued...)

On its return for the tax year ended November 30, 1997, petitioner reported only $500,000 of the $2.5 million NSI fee received on January 30, 1997. Petitioner did not report the $2 million portion of the NSI fee as income.

On the CKH and CKH's affiliates consolidated income tax return filed for the short tax year October 22, 1996, through March 31, 1997, CKH reported the $2 million portion of the NSI fee transferred by petitioner. The $2 million of income was offset by CKS's $2,079,706 reported loss for that year and a $1,739,488 NOL carryover from prior years.

In the notice of deficiency for the taxable year ended November 30, 1997, respondent determined that the $2 million portion of the NSI consulting fee was includable in petitioner's income. Petitioner alternatively alleged in the petition that, in the event this $2 million portion of the NSI fee was held to be taxable to petitioner, petitioner should be entitled to deduct the $2 million payment to CKH as a business expense.

### 2. Petitioner's Advances to Koehler

On August 31, 1994, Koehler executed a demand promissory note to petitioner for $31,705 for advances that petitioner had made to Koehler over a period extending back to the 1980s.

---

[16](...continued)
to be retained by CKS. The parties, however, stipulated that $134,000 was the amount that CKS actually retained. The record does not disclose the reason for this $2,000 discrepancy.

Before August 31, 1994, there was no note evidencing the $31,705. The demand promissory note also covered additional principal amounts advanced by petitioner to Koehler that were to be added to the $31,705 shown on a schedule attached to the note. Interest, at the rate of 5 percent, was provided for from the date of each principal disbursement.

Beginning on August 31, 1994, through December 30, 1994, petitioner advanced an additional $45,000 to Koehler, in nine semimonthly payments of $5,000 each on the 15th and the last day of each month. Before the $5,000 semimonthly payments, Koehler had been receiving monthly compensation from Cap Corp. Koehler suggested that petitioner label the $5,000 payments to Koehler as loans, as opposed to compensation, because Koehler's former wife was then seeking increased alimony payments.

Koehler had experienced financial difficulties since his divorce in 1987 or 1988 and was paying $4,000 in monthly alimony. From at least 1992 through 1996, Koehler's financial condition was poor, and he was unable to repay the advances received from petitioner. By August 31, 1994, when petitioner began making its nine $5,000 semimonthly payments to Koehler, Crispin knew that Koehler was insolvent.

Beginning on August 31, 1994, through December 1, 1995, $4,555 in interest accrued on the August 31, 1994, demand promissory note. During that same period, Koehler paid

petitioner accrued monthly note interest in varying monthly amounts totaling $4,555.

As of December 31, 1994, Koehler owed petitioner $76,705 under the August 31, 1994, demand promissory note.  Koehler did not make principal payments on the $76,705 note.  Petitioner has not sought repayment of the $76,705 advanced to Koehler.

On its return for the taxable year ended November 30, 1996, petitioner deducted as a miscellaneous expense the $76,705 advanced to Koehler.  In the notice of deficiency, respondent disallowed the deduction.  Respondent determined that it had not been established that this $76,705 (1) was an ordinary and necessary business expense and (2) had been expended for the purpose stated.

OPINION

The factual circumstances in this case consist of a Byzantine labyrinth of complex transactions.  Most of the transactions were generated to achieve a tax effect.  We must decide whether these transactions should be respected.  Some of the transactions we consider present less sophisticated questions such as when and by whom income should be reported or whether certain deductions should be allowed.  The specific issues we consider involve:  (1) Petitioner's entitlement to more than $2.7 million of deductions from the second lease strip deal for its taxable years ended November 30, 1996 and 1997; (2) petitioner's

entitlement to a $2,052,900 ordinary loss and a $1,859,135 business bad debt deduction for 1997 with respect to advances to Cap Corp.; (3) $2 million of the NSI consulting fee and (a) whether it is includable in petitioner's 1997 income, and (b) if it is includable in income, whether petitioner is entitled to a $2 million business deduction for 1997; (4) petitioner's entitlement to a $76,705 business bad debt deduction for 1996 concerning loans to Koehler; and (5) whether petitioner is liable for penalties under section 6662.

I.   Petitioner's Second Lease Strip Deal

Petitioner arranged lease strip deals using tax-indifferent parties and series of complex multiparty transactions to secure substantial tax benefits exponentially larger than taxpayers' economic investments in the deals.  The parties' arguments concerning these deals involve questions of substance versus form.  Petitioner relies on the form of the  transactions, and respondent relies on the substance.  Specifically, respondent contends that petitioner's second lease strip deal lacks economic substance and should not be respected for tax purposes. Alternatively, respondent contends that petitioner's claimed rental expenses and note disposition losses are neither ordinary and necessary business expenses under section 162 nor otherwise deductible losses under section 165.

A.  Did the Underlying Transactions Have Economic
    Substance?

    1.  Generally

If a transaction is found not to have economic substance, the form of the transaction may be disregarded in determining the proper tax treatment to be accorded that transaction.  Numerous courts have held that a transaction that is entered into primarily to reduce tax and which otherwise has minimal or no supporting economic or commercial objective, has no effect for Federal tax purposes.  Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Gregory v. Helvering, 293 U.S. 465 (1935); ACM Pship. v. Commissioner, 157 F.3d 231, 246-247 (3d Cir. 1998), affg. in part and revg. in part T.C. Memo. 1997-115; United States v. Wexler, 31 F.3d 117, 122, 124 (3d Cir. 1994); Yosha v. Commissioner, 861 F.2d 494, 498-499 (7th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986); Goldstein v. Commissioner, 364 F.2d 734, 740-741 (2d Cir. 1966), affg. 44 T.C. 284 (1965); Nicole Rose Corp. v. Commissioner, 117 T.C. 328, 336 (2001), affd. 320 F.3d 282 (2d Cir. 2002).

The determination of whether a transaction lacks economic substance requires a consideration of the facts and circumstances surrounding the transaction, with no single factor being determinative.  United States v. Cumberland Pub. Serv. Co., 338

U.S. 451, 456 (1950).  Whether a taxpayer's characterization of a transaction should be respected depends upon whether there is a bona fide transaction with economic substance, compelled or encouraged by business or regulatory realties, imbued with tax-independent considerations, and not shaped primarily by tax avoidance features that have meaningless labels attached.  See ACM Pship. v. Commissioner, supra; Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990), affg. Sturm v. Commissioner, T.C. Memo. 1987-625; Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254 (1999), affd. 254 F.3d 1313 (11th Cir. 2001).

In deciding whether a transaction or series of transactions lacks economic substance, courts have used a two-pronged inquiry: (1) A subjective inquiry as to whether the transaction(s) was carried out for a valid business purpose; and (2) an objective inquiry concerning the economic effect of the transaction(s). ACM Pship. v. Commissioner, supra at 247-248; Casebeer v. Commissioner, supra at 1363; Kirchman v. Commissioner, 862 F.2d 1486, 1490-1491 (11th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986); Nicole Rose Corp. v. Commissioner, supra.  We note that the two tests have much in common and are not necessarily discrete prongs of a "rigid two-step analysis". Casebeer v. Commissioner, supra at 1363.

The consideration of whether there is a valid business purpose has been described as an inquiry into whether the transaction is motivated by profit or economic advantage so as not to be considered a "sham for purposes of analysis under I.R.C. § 165(c)(2)." Kirchman v. Commissioner, supra at 1491. That inquiry has been similarly described as one where the court considers whether the transaction is "rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and * * * economic situation". ACM Pship. v. Commissioner, T.C. Memo. 1997-115. This evaluation of the practicability or utility of the stated nontax purpose and the rationality of the means used to achieve that nontax purpose are to be evaluated in accordance with commercial practices in the relevant industry. Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987).

Consideration of the economic effect of the transaction(s) in question involves an objective inquiry concerning whether the transaction appreciably affected the taxpayer's beneficial economic interest, absent tax benefits. Knetsch v. United States, 364 U.S. 361, 366 (1960); ACM Pship. v. Commissioner, 157 F.3d at 248. For example, where offsetting legal obligations or circular cashflows effectively eliminated any real economic profit from the transaction, the transaction was considered to be without economic effect. Knetsch v. United States, supra at 366;

Hines v. United States, 912 F.2d 736, 741 (4th Cir. 1990). De minimis or inconsequential pretax profits relative to a taxpayer's artificially and grossly inflated claim of potential tax benefits may be insufficient to imbue an otherwise economically questionable transaction with economic substance. ACM Pship. v. Commissioner, 157 F.3d at 257; Sheldon v. Commissioner, 94 T.C. 738, 767-768 (1990).

2. Background and Recapitulation of the Two Lease Strip Transactions

Petitioner is a privately held corporation owned and controlled by Crispin, its 98-percent shareholder and ultimate decision maker. Petitioner was generally involved in equipment leasing transactions and helping to structure the financing of equipment, including the arranging of lease strip deals. Through the maneuvering of certain equipment and existing leases through a preconceived series of transactions using several entities, rental income and related rental expenses are bifurcated and reallocated to different parties. Virtually all of the rental income is stripped out and allocated to a tax-indifferent party in order to provide a disproportionately large share of tax benefits (deductions) to a taxpayer. In addition, the character of the income may be changed; i.e., capital gains are converted to ordinary income or vice versa. By late 1994, petitioner had extensive experience in arranging lease strip deals.

Before November 1994, CLI (an entity unrelated to petitioner) owned certain computer, photo processing, and satellite dish equipment that was leased to various entities unrelated to petitioner. Most of these existing leases were scheduled to end during the spring, summer, or winter of 1997.

In late 1994 and early 1995, petitioner arranged a first lease strip deal for CFX. According to a tax opinion, CFX, in exchange for a cost of approximately $2.9 million, would receive approximately $13.8 million in deductions. The $2.9 million to be paid by CFX was divided among the participants and others who arranged the deal, including CLI and petitioner. Petitioner earned $611,655 for its services in arranging the first lease strip deal for CFX.

A second lease strip deal involving some of the same equipment was initiated approximately 9 months later. In the first and second lease strip deals there were at least 17 interrelated transactions with respect to the same equipment. Under the second lease strip deal, petitioner claimed over $4.2 million in deductions for 1995, 1996, and 1997. Petitioner's out-of-pocket cost for the "investment" in its second lease strip deal approximated 1 percent of the claimed deductions or slightly more than $40,000.

The first lease strip deal (for CFX) and the second lease strip deal (for petitioner) involved equipment already subject to the following leases: (1) A lease of photo processing equipment to K-Mart (a large retailer), and (2) a lease of computer equipment to Shared (a medical services provider). Late in 1994, the K-Mart and Shared leases each had only a few years left to run.

The transactions used to effect the first lease strip deal included: (1) The purchase of computer, photo processing, and satellite dish equipment already subject to existing end-user leases with K-Mart, Shared, and others; (2) "taxable sale"-leaseback transactions of that equipment by CFP, a partnership and a tax-indifferent partner under the sale-leaseback partnership, (a) where CFP was issued an equipment purchase installment note with the installments equal to and offset by the rental payments due under the wraparound lease entered into by CFP, and (b) CFP's leaseback of that equipment under a wraparound lease encompassing those existing end-user leases; (3) a lease strip sale by CFP whereby virtually all of the rental income with respect to those existing end-user leases was stripped out and allocated to the Iowa Tribe, a tax-indifferent party and 99-percent limited partner of CFP; and (4) the transfer in a

purported section 351 transaction by CFP to CFX Financial (a subsidiary of CFX) of (a) the wraparound lease position and (b) the equipment purchase installment note or payment rights.

In the second lease strip deal, in which petitioner was the customer/taxpayer, similar transactions were employed including "taxable sale"-leaseback transactions and a rent strip sale involving the Iowa Tribe, a tax-indifferent party, to generate deductions disproportionately larger than petitioner's economic investment in that deal. Unlike the beneficiary of the first lease strip deal, petitioner did not retain the over lease wraparound lease position for the entire life of the lease. Instead, petitioner disposed of its over lease position and the accompanying equipment installment note in a series of three transactions during a 21-month period from November 27, 1995, through September 1, 1997.

Normally, in lease strip deals structured by petitioner, the tax benefits customer was wholly unrelated to petitioner. In the second deal, however, petitioner was the tax benefits customer that claimed the deductions from the lease strip deal with respect to the same K-Mart and Shared equipment. After arranging the first lease strip deal for CFX, petitioner reconfigured, refined, and reused the ownership of the K-Mart and Shared equipment, the K-Mart and Shared end-user leases, and the master lease to create a second lease strip deal and the over lease

wraparound lease involving the same equipment.  Originally, petitioner planned to market the second lease strip deal to an unrelated customer.  Petitioner, however, decided to claim over $4.2 million in deductions itself.

Petitioner contends that it was forced to become involved in the second lease strip deal because of the IRS's October 30, 1995, issuance of Notice 95-53, 1995-2 C.B. 334.  The purpose of that notice was to discourage such lease strip deals.  In Notice 95-53, 1995-2 C.B. at 334-335, the IRS (1) described a lease strip deal which, in all material respects, was substantially similar to the first and second lease strip deals we consider here, and (2) warned that the IRS would challenge and, on various grounds, disallow the claimed tax benefits under such lease strip deals.  Notwithstanding the IRS's warning in Notice 95-53, supra, petitioner deducted more than $4.2 million for 1995, 1996, and 1997 from its involvement in the second lease strip deal.

In the first lease strip deal, involving CFX, the complex multiparty equipment purchase, lease, and other transactions were entered into on November 1 and 30, 1994, December 2, 1994, and January 3, 1995.  In petitioner's second lease strip deal the

complex multiparty transactions were entered into on August 31, September 1, September 28, and November 27, 1995; and on October 31, 1996, and September 1, 1997.[17]

### 3. Petitioner's Rental Expense Deductions and Note Disposition Losses

On its 1995 tax return, petitioner claimed CMACM's purported $1,982,825 loss from partial disposition of the $4,056,220 Jenrich note to Okoma, resulting in petitioner's $404,000 NOL for 1996. On its 1996 tax return, petitioner reported that CMACM had a $469,221 cost basis for the portion of the $4,056,220 note transferred to Lexington for an unsecured $10,000 promissory note on October 31, 1996. On the basis of that, petitioner claimed CMACM's $459,221 loss on the partial disposition of the Jenrich note. Petitioner also claimed $414,041 as rental expenses on its 1996 tax return attributable to CMACM's 1996 purported over lease rental payments. CMACM's claimed rental expenses equaled, and were completely offset by, the amounts due petitioner under Jenrich's equipment purchase installment note.

---

[17]Attached to this opinion as app. A is a 3-page, 17-step flow chart reflecting the basic elements of the transactions. Attached as app. B is a single-page summary of app. A. Apps. A and B were prepared by respondent and used during the trial as an aid to understanding the various steps in the questioned transactions. The appendixes were not received in evidence, but were marked for purposes of identification. These charts are included solely to aid in better understanding the complex fact pattern in this case.

On its 1997 tax return, petitioner reported that CMACM had a $1,179,013 cost basis for the remaining portion of the $4,056,220 Jenrich note that CMACM transferred to Lexington for Lexington's $1,000 unsecured promissory note. On the basis of that, petitioner claimed a $1,178,013 loss on the partial disposition of the Jenrich note to Lexington. Petitioner also claimed $237,853 of rental expenses on its 1997 tax return attributable to CMACM's purported over lease rental payments during 1997. The rental expenses claimed by CMACM equaled, and were completely offset by, the amounts due to CMACM under Jenrich's equipment purchase installment note.

Finally, on its 1998 tax return, petitioner claimed deductions for the worthlessness of Lexington's $10,000 and $1,000 unsecured promissory notes.

In sum, on the basis of its $10 investment in stock and assumption of a purported $215,000 obligation owed by CAP to EQ, petitioner claimed over $4.2 million in deductions from the second lease strip deal transactions. ($1,982,825 + $459,221 + $414,041 + $1,178,013 + $237,853 + $10,000 + $1,000 =

$4,282,953.[18])  As of September 1, 1997, petitioner's actual out-of-pocket cost was approximately $40,000.

### 4.  Did Petitioner Have a Nontax Business Purpose for Entering Into the Second Lease Strip Transaction?

The second lease strip deal was designed to provide substantial tax benefits for petitioner.  Petitioner acknowledges that its only possibility for realizing an economic profit from the over lease position depended upon rental income being produced from the residual lease interests with respect to the K-Mart and Shared equipment.  The lease term in petitioner's over lease agreement, however, provided for no actual residual interests in the K-Mart and Shared equipment.  The over lease agreement specified a lease term for the K-Mart and Shared equipment that expired on the same dates as the master lease respecting that equipment.  Although acknowledging that the over lease agreement provided respective termination dates of October 31, 2002, and April 30, 2000, with respect to the K-Mart and Shared equipment, petitioner and Crispin assert that the over lease termination dates are a "drafting error".  Petitioner and Crispin maintain that the over lease was meant to run:  (1) From August 31, 1995, through February 28, 2004, in the case of the K-

_____

[18]The $10 stock investment and the $215,000 obligation represented petitioner's only actual out-of-pocket expenditures. As of the years under consideration, however, petitioner had paid only $40,000 of the $215,000 obligation.  All other purported obligations were part of circular flows so that petitioner was not required to make any out-of-pocket expenditures.

Mart equipment, and (2) from August 31, 1995, through February 28, 2002, in the case of the Shared equipment.

Petitioner did not offer a reasonable explanation as to why it was necessary for CMACM (petitioner's subsidiary and affiliate) to acquire petitioner's purported over lease residual interests in the K-Mart and Shared equipment, and for CMACM, pursuant to the purported section 351 transfer from CAP, to acquire and/or assume (1) the rental payment obligation for the entire life of the over lease and (2) the Jenrich equipment purchase installment note. In that regard, there appears to have been no concern on petitioner's part in structuring this second lease strip deal about Jenrich's questionable financial condition and ability to make payments on the installment note. Ultimately, any note installments paid by Jenrich and over lease rental payments by CMACM would be completely offset so that no cash payments would have to be made by CMACM or by Jenrich.

In the first lease strip deal for CFX, petitioner had a business purpose and profit motive; viz, obtaining a fee of more than $611,000 for arranging the lease strip deal for CFX. Petitioner, however, has not shown any credible business purpose for its involvement in the second lease strip deal other than its intent to claim $4.2 million in tax benefits. The second lease strip deal was structured to strip out the equipment rental income and reallocate it to the tax-indifferent Iowa Tribe in

order to leave petitioner with deductions of more than $4.2 million.  Petitioner sought to claim these tax benefits because it was unable to sell the deal to others because of the IRS's October 30, 1995, issuance of Notice 95-53, 1995-2 C.B. 334, warning of the IRS's intention to challenge and disallow tax benefits claimed under lease strip deals.

Petitioner contends that this case is "fact driven, and this Court must ultimately decide whose version of the facts is correct."  Petitioner argues that it was in the business of structuring leasing transactions and that the two lease strip deals under consideration did not differ from and were typical of contemporaneous lease strip deals.  Finally, petitioner argues that it was genuinely motivated to seek a pretax economic profit.

In effect, petitioner asks this Court to accept its version of the facts, including the premise that the second lease strip deal employs the same form as similar lease strip deals being conducted at that time.  It is well settled that the mere execution of documents assigning labels to aspects of a transaction does not automatically result in their being respected for tax purposes.  Similarly agreements which, on their face, formally comply with the requirements of a statute do not give substance to a transaction which in reality has no economic substance.  See Gregory v. Helvering, 293 U.S. at 468.  We must decide whether what was done, apart from the tax motive, was what

the statute intended.  Id. at 469; see also Knetsch v. United States, 364 U.S. at 365.  Even if we accepted petitioner's premise that the second lease strip deal was a typical deal, petitioner's approach focused solely on form with no regard for the substance.  The lease strip deals we consider in this case are mere tax-avoidance devices or subterfuges mimicking a leasing transaction.  The obvious purpose was to obtain unwarranted and substantial tax benefits.

We first consider whether petitioner subjectively had a valid, nontax business purpose for entering into the second lease strip deal.  See ACM Pship. v. Commissioner, 157 F.3d at 247-248; Casebeer v. Commissioner, 909 F.2d at 1363.

Petitioner claims to have entered the lease strip deal to hold the over lease residual interests in the K-Mart and Shared equipment because it expected to earn a pretax profit from the equipment rental income or the income produced from disposition of the residual interests.  The over lease agreement, however, provides for a lease term under which petitioner would have no residual interests in the equipment because the agreement specifies a lease term that expires on the same date as the master lease respecting the same equipment.  Thus the operative legal document governing petitioner's rights contains a fundamental flaw and does not support petitioner's over lease position.  Significantly, petitioner's failure to discover and/or

remedy this fundamental flaw undercuts petitioner's contention that it had a genuine pretax profit motive and a valid nontax business purpose for entering into the lease strip deal. Indeed, the flaw in the agreement escaped petitioner's notice and that of others representing Okoma and Lexington, the two entities to which CMACM disposed of part of CMACM's over lease position in a series of three transactions from November 28, 1995, through September 1, 1997.

Petitioner attempts to counter the effect of what it terms an "ambiguity" by contending that "Crispin, CMA [petitioner], and its personnel would not have entered into a transaction for any consideration [where that transaction] * * * did not give them the residual period they thought they were buying, mainly because no customer would have even considered buying a nonexistent position from CMA." We are skeptical of petitioner's argument. Petitioner and CMACM had extensive experience in arranging lease strip deals. If petitioner and Crispin were unsophisticated or relied on others, their argument might be more colorable. But here, the "experts" bought their own "product" with a major drafting flaw and fundamental defect. Under these circumstances, we conclude that the substantive rights were of no import to these "experts" and that they viewed the transactions with indifference. For petitioner the transactions were solely a means for securing a tax advantage. If petitioner and Crispin

had been genuinely concerned about the pretax profit potential, they would have carefully reviewed the over lease agreement to ensure that the residual lease periods were properly defined.

Petitioner's lack of interest or concern is inconsistent with a genuine pretax profit motive for entering into the second lease strip deal. Other than self-serving testimony, petitioner offered no preinvolvement documents reflecting the value of the lease transaction rights. Notwithstanding petitioner's claimed pretax profit motive, it did not hold the over lease position for very long. Petitioner caused CMACM to dispose of its position to Okoma and Lexington in a series of three transactions from November 27, 1995, through September 1, 1997. In the consummation of the three transactions, Crispin and petitioner's personnel failed a second time to discover the fact that there was no over lease term. We note that Crispin, as CMACM's president, personally executed each assignment and assumption agreement by which CMACM disposed of a portion of its over lease position to either Okoma or Lexington.

On or about March 25, 1996, when CMACM and Jenrich agreed to offset CMACM's over lease rental payment liability and Jenrich's installment note liability against one another, petitioner and its personnel on a third occasion failed to discover the overlap of the lease terms.

On the basis of the foregoing, we hold that petitioner did not have a pretax profit motive. We also hold that petitioner had no valid nontax business purpose for entering into the second lease strip deal. See Casebeer v. Commissioner, 909 F.2d at 1363-1364; Nicole Rose Corp. v. Commissioner, 117 T.C. at 336-338; ACM Pship. v. Commissioner, T.C. Memo. 1997-115.

### 5. Whether Petitioner's Lease Strip Deal Had Economic Profit Potential Aside From the Tax Benefits

We now turn to the second prong of our inquiry involving an objective inquiry into the economic effect of the series of transactions and whether it appreciably affected petitioner's beneficial economic interest, aside from potential tax benefits. See ACM Pship. v. Commissioner, 157 F.3d at 246-248; Casebeer v. Commissioner, supra at 1363.

In this inquiry, we examine the potential for economic profit from petitioner's over lease residual interests in the K-Mart and Shared equipment. As discussed above, there were no over lease residual interests because the over lease agreement expired on the same date as the master lease. Even assuming that petitioner had acquired some over lease residual interests in that equipment, those interests had no residual value and/or little if any potential for rental income. A September 28, 1995, forecast respecting the residual interests would have revealed that, by the time the residual interest periods began, there would have been: (1) No residual value for that equipment and/or

(2) no projected equipment rental income to be earned from that equipment. Respondent's expert Peter Daley opined that, as of September 28, 1995, with one de minimis exception, the K-Mart and Shared equipment would have no estimated residual value by the critical date, May 1, 2000. The exception concerned photo equipment with a nominal value of $194.

We emphasize, however, that petitioner did not obtain a pre-September 28, 1995, outside appraisal of its residual interests. Instead, Hughes (petitioner's tax and accounting manager), sometime before September 28, 1995, prepared a valuation analysis of those over lease residual interests. Crispin and Hughes both testified that this valuation analysis was based upon extending the 10- to 12-year equipment "yield decline curve" that had been used in the Marshall & Stevens appraisal to value CFX's first lease strip deal residual interests in the K-Mart, Shared, and other existing lease equipment. We note that petitioner did not offer into evidence any document containing the details of Hughes's pre-September 28, 1985, valuation analysis.

In addition, the Marshall & Stevens appraisal was not received in evidence for purposes of establishing the probative value of the conclusions therein or as opinion because no expert testimony was offered. Respondent also points out that this Court, in other cases, has rejected the valuation methodology of Marshall & Stevens appraisals in cases involving computer

equipment.  See Nicole Rose Corp. v. Commissioner, 117 T.C. at

338; Coleman v. Commissioner, 87 T.C. 178, 199 (1986), affd.

without published opinion 833 F.2d 303 (3d Cir. 1987); Smoot v.

Commissioner, T.C. Memo. 1991-268.  Marshall & Stevens applied a

10-year "yield decline curve" to computer equipment that was

assumed to have a life of 10 years.  The 10-year assumption was

used even though the equipment under consideration had been

introduced into the market place a number of years before the

transaction.

The right to the equipment rental income for the remaining

terms of the underlying leases had considerable value, as each

lessee was highly creditworthy and in all events, the lessee was

required to make the scheduled rental payments.  In the first

lease strip deal on November 30, 1994, HCA paid $11.763 million

to acquire the equipment rental stream due from K-Mart, Shared,

and other end users under the existing end-user leases.[19]  By

contrast, the rental stream under the over lease residual

interests had a substantially lower potential for value.

The following factors reflect that there was little

potential for value or rental income from the over lease residual

interests:  (1) The original leases were entered into before

January 3 and September 28, 1995; (2) the equipment subject to

---

[19]Attached to this opinion as app. C is a schedule detailing the monthly rental payments that Hitachi Credit America Corp. (HCA) purchased in the Nov. 30, 1994, rent strip sale.

each existing lease had been declining in value since the lease was entered into; (3) the equipment could only be expected to continue to decline in value; (4) the existing end-user leases each had a few years to run before CFX's master lease residual interest periods and then petitioner's purported over lease residual interest periods with respect to that equipment would have begun;[20] (5) the first 2 years of the master lease residual interest in the K-Mart end-user lease equipment and the first 6 months of the master lease residual interest in the Amoco end-user lease equipment were "sold" to Residco; and (6) no lease arrangement with a potential user was in place for the period following the termination of the existing leases. Any such lease arrangements would have to be negotiated at some future point either with the equipment's current end user or with another possible user.

In that regard, one of petitioner's experts acknowledged that the projected future monthly rental income to be earned under (1) the master lease residual interests and (2) the over lease residual interests would be substantially less than the monthly rental income due under the existing end-user leases on that equipment.

---

[20]The existing Shared and K-Mart end-user leases expired no later than Mar. 29 and Jul. 31, 1997, respectively. The existing HIP NY end-user lease expired on Dec. 31, 1997; the existing Martin Marietta end-user lease expired on May 31, 1997; and the existing Amoco end-user lease expired on Mar. 31, 2000.

### a.  The Experts' Opinions

Respondent's expert, Peter Daley (Daley), opined that, as of September 28, 1995, the K-Mart and Shared end-user lease equipment would:  (1) Have almost no estimated residual value when petitioner's purported over lease residual interest periods began; and (2) not generate rental income during the over lease residual interest periods.  Obviously, if the over lease residual interests had minimal or no value when acquired, petitioner would not pass the second prong of the economic substance test.

Petitioner's expert, Robert S. Svoboda (Svoboda), opined that the over lease residual interests had a fair market value of $122,000 to $263,000 as of September 28, 1995.  Petitioner contends that it should succeed if it establishes that there was a projected rental income above $215,000[21] as of September 28, 1995.  In other words, petitioner argues that the economic substance test is met if it shows that as of September 28, 1995, some potential existed for petitioner's earning a pretax profit. In that regard, petitioner also argues that its projected future over lease residual interest rental income need not be discounted to its present value as of September 28, 1995.

_____

[21]This amount would have been petitioner's maximum out-of-pocket cost if the note obligation had been fully paid.  We note, however, that petitioner had paid only $40,000 of the $215,000 as of the time under consideration.

Conversely, respondent argues that any projected future over lease residual rental income must be discounted to its present value as of September 28, 1995. Respondent also argues that the value of the residual interests must be commensurate with or in some way reasonably proportionate to petitioner's claimed potential tax benefits from the second lease strip deal.

In our consideration of the experts' opinions we may accept or reject expert testimony, in whole or in part. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976) (and cases cited thereat), affg. T.C. Memo. 1974-285.

### i. Petitioner's Expert

Svoboda was asked to provide an opinion as to the fair market values, as of September 28, 1995, of the underlying K-Mart photo processing and Shared computer equipment. He also estimated the future residual values for the K-Mart and Shared equipment when (1) the existing or prior lease of that equipment terminated, and (2) the over lease residual interest periods began. Svoboda also determined the fair market value, as of September 28, 1995, of petitioner's over lease residual interests in the K-Mart and Shared equipment. For purposes of his appraisal, Svoboda added to the classical definition of "fair market value" the assumption that the buyer and seller contemplate the retention of the properties by the current end-

user lessees.[22]  Although Svoboda has over 25 years of appraisal experience, he had relatively little experience valuing residual interests in equipment with useful lives of 10 years or less.

(a)  Svoboda's Opinions as to the Fair Market Values and Estimated Residual Values

Svoboda concluded that, as of September 28, 1995, the K-Mart and Shared equipment had the following fair market values and estimated future residual values:

|  |  | Estimated Future Residual Value On: | | | | | |
|---|---|---|---|---|---|---|---|
| Equipment | Fair Market Value | 2-24-97 | 3-13-97 | 6-30-97 | 7-31-97 | 5-1-00 | 11-1-02 |
| K-Mart |  |  |  |  |  |  |  |
| No. 32 | $116,844 | -- | -- | -- | $50,076 | -- | $8,346 |
| No. 33 | 473,452 | -- | -- | -- | 295,908 | -- | 29,591 |
| No. 34 | 1,215,504 | -- | -- | $759,690 | -- | -- | 151,938 |
| Shared |  |  |  |  |  |  |  |
| No. 5 | 567,521 | -- | $133,471 | -- | -- | -0- | -- |
| No. 6 | 143,052 | $30,654 | -- | -- | -- | -0- | -- |

Svoboda primarily used the sales comparison approach to value the Shared computer equipment.  His opinion was based on published market data on this equipment, including reports published by respondent's expert, Daley.  Svoboda concluded that the Shared computer equipment would have no residual value by May 1, 2000, the date when petitioner's over lease residual interest in that equipment began.

---

[22]Svoboda also assumed that petitioner was contractually entitled to income from the over lease residual interest periods, a fact that is not supported by the operative documents.

In valuing the K-Mart photo processing equipment, however, Svoboda was unable to find published market data. Accordingly, he relied on (1) discussions with equipment brokers and used equipment dealers and (2) information on that equipment from the market at the time he prepared his report. His research uncovered very little information regarding the equipment during the mid-1990s. Although the manufacturers' representatives for the K-Mart equipment indicated that the K-Mart equipment might have either a 5- to 7-year life or an 8- to 10-year life, Svoboda determined that the K-Mart equipment had a 10-year useful life. He set a 5- or 10-percent "floor" or selling price for the K-Mart equipment at the end of its useful life and developed a depreciation curve to reach the K-Mart equipment's fair market values and future residual values.

(b) Svoboda's Fair Market Value for
the Over Lease Residual Interests

Svoboda opined that the residual interests in the K-Mart and Shared equipment had a fair market value ranging from $122,000 to $263,000. He considered the three traditional approaches (i.e., sales, income, and cost) for valuing equipment and chose the income approach, explaining that "the cost approach was not applicable and comparable sales were not available."

Svoboda chose the income approach because "Ultimately the value of the over lease residual * * * [interests] equates to the present worth of future benefits". His "goal was to quantify the

future benefits and convert them to present value using a discount rate commensurate with the risk associated with obtaining those benefits". He considered three variables including: (1) Quantifying the future benefits; (2) determining the appropriate discount rate; and (3) determining the time required to achieve those benefits and quantifying the risks associated with achieving those benefits.

In order to quantify the future benefits of the residual interests, Svoboda used the same monthly rental income generated during the preceding leases. Recognizing that those monthly rates were too high, he used an "anticipated realization factor" to project the future rental income. This adjustment, according to Svoboda, would take into account (1) the likelihood that the equipment would be leased during petitioner's over lease residual interest periods, and (2) the anticipated decline in monthly rents for the equipment over time. Relying heavily upon his conversations with Paul Raynault (Raynault), CLI's chairman and 50-percent shareholder, concerning the likelihood that K-Mart and Shared would continue to rent after the existing leases expired, Svoboda determined that his anticipated realization factors should be 25 to 50 percent for the K-Mart photo processing equipment and 1 to 5 percent for the Shared computer equipment. With respect to the Shared computer equipment, Svoboda recognized that technology was changing rapidly and that there would be

increased pressure on the lessees to replace computer equipment.
Additionally, by the mid-1990s computer equipment manufacturers
were inclined to offer significant financial incentives to
potential customers.  Svoboda applied a 10-percent discount
factor to account for those factors.  Svoboda's fair market value
opinion concerning the over lease residual interests is
summarized as follows:

| | Anticipated Realization Factor Percentage Range | | Present Value of Projected Future Rental Income[1] | |
|---|---|---|---|---|
| Equipment | Low | High | Low | High |
| K-Mart | 25 percent | 50 percent | $116,292 | $232,585 |
| Shared | 1 percent | 5 percent | 6,036 | 30,182 |
| Total and FMV[2] | | | 122,000 | 263,000 |

[1]Determined by applying a discount factor of 10 percent.
[2]Rounded to nearest $1,000.

### ii.  Respondent's Expert

Daley concluded that, as of September 28, 1995, the K-Mart
photo processing and Shared computer equipment would:  (1) Have
an inconsequential estimated residual value at the beginning of
the residual lease periods, and (2) generate no future rental
income during those residual lease periods.  He also concluded
that the K-Mart and Shared equipment would have a total combined
estimated value of $499,406 at the end of the original leases.

Daley is president of Daley Marketing Corp. (DMC), a company that prepares and publishes market and residual value reports for computer equipment. DMC collects and maintains a data base of information concerning the market and residual values of computer equipment. The sources of the data are brokers, dealers, and lessors, and the reports have been published quarterly since 1985. DMC reports are used as a reference by many companies, including Fortune 500 companies, to ascertain computer equipment values. Petitioner subscribed to these reports during 1995.

Daley also considered the three traditional approaches (i.e., sales, income, and cost) to valuing equipment and selected the market approach because of the availability of actual sales and offering prices for the same or similar equipment. He reasoned that an actual market for equipment presents a more direct and reliable indicator of fair market value.

The methodology used to convert raw equipment information obtained from brokers, dealers, and lessors into DMC residual value reports includes the adding of a gross margin to arrive at an "end user" fair market value. In addition, the forecasting of future value includes the development of a depreciation curve to adjust for new technology, supply and demand, continued viability of the manufacturer, competition, and other market factors. On the basis of that methodology, Daley's judgment is that the equipment we consider here reaches a salvage value of 2 percent

of list price.  In Daley's judgment, the value of the equipment reaches "salvage value" when the equipment is "scrapped or sold off to third party maintenance companies" for spare parts.

Daley concluded that by May 1, 2000, with one exception, the K-Mart and Shared equipment would have no estimated residual value.  The one exception was a piece of photo processing equipment that Daley estimated would have a nominal residual value of $194.

Daley used DMC's compiled computer equipment reports to determine the residual values for the Shared computer equipment. With respect to the K-Mart photo processing equipment, Daley compiled information from a similar data base on photo processing equipment.  Using a similar methodology as he used for computer equipment, Daley arrived at the conclusion that the K-Mart equipment would have no residual value.

On the basis of that analysis and using a 10-percent interest or discount rate, Daley projected the future rental income the K-Mart and Shared equipment would produce during the master lease and over lease periods.  He projected that the K-Mart and Shared equipment would produce no rental income during the purported over lease.

Daley opined that the underlying K-Mart and Shared end-user lease equipment had the following fair market values as of the dates specified below:

| Equipment | Fair Market Value | | |
|---|---|---|---|
| | Nov. 1, 1994 | Aug. 31, 1995 | Sept. 28, 1995 |
| K-Mart | $1,651,272 | $1,093,247 | $1,041,105 |
| Shared | 2,396,764 | 1,394,450 | 1,188,847 |

Daley further opined that, as of September 28, 1995, the K-Mart and Shared equipment would have the following estimated residual values on the dates shown below and could be expected to produce no rental income during the purported over lease residual interest periods, as follows:

| Equipment | Estimated Residual Value | | | |
|---|---|---|---|---|
| | 3-1-97 or 4-1-97 | 7-1-97 or 8-1-97 | 5-1-00 | Over Lease Int. Pds.[1] Proj. Rental Income |
| K-Mart | -- | $378,486 | $194 | -0- |
| Shared | $120,920 | -- | -0- | -0- |

[1]The over lease periods are: (1) From Nov. 1, 2002, through Feb. 28, 2004, in the case of the K-Mart equipment, and (2) from May 1, 2000, through Feb. 28, 2002, in the case of the Shared equipment.

### b. Evaluation and Comparison of the Experts

In many respects, the experts' reports were terse and lacking in adequate detail and explanation. In particular, Svoboda's opinions as to fair market value and projected future rental income were premised on questionable and purely speculative judgments. We found Daley's report to be short on some details, but more objective and less speculative.

Although Svoboda agreed with Daley that the Shared computer equipment would have no value by the start of the residual lease period, Svoboda claimed "it would be reasonable" to expect that

petitioner would earn some future rental income from leasing it. He based this claim upon 1994 and 1995 discussions with Raynault. Raynault stated that during the early 1990s there had been some experience of continued use for a few years following the end of an initial lease term.  As a result, Svoboda concluded that petitioner's prospect of realizing equipment rental income from the Shared equipment during the residual lease period was "speculative" but possible.  We agree that Svoboda's conclusion is speculative and without support in the record.  We note that Shared had no commitment to use the equipment beyond the end of the existing lease (March 29, 1997), and no other prospective lessee had been identified.  Significantly, Svoboda's opinion that there was potential for rental income is contradictory to his recognition that the equipment would then have exceeded its commercial useful life and be technologically obsolete.

Svoboda's conclusion is inconsistent with traditional definitions of "fair market value".  Under traditional willing-buyer-willing-seller tests, lack of value and relatively minimal utility are relevant facts in valuation.  Svoboda's valuation did not take into account these highly relevant factors.  In that regard, the record reveals that technology changes for this type of equipment can render it obsolete.

Regarding the K-Mart photo processing equipment, Svoboda's level of experience and expertise in valuing equipment with a 10-year or less useful life is inferior to that of Daley. Accordingly, we give less weight to Svoboda's conclusions regarding (1) the fair market values of the K-Mart photo processing equipment and the Shared computer equipment, (2) the estimated residual value of the K-Mart equipment, and (3) the fair market value of petitioner's over lease residual interests in the K-Mart and Shared equipment.

Although Daley's opinion was also lacking in detail, we have more confidence in Daley's valuation and find his approach and assumptions to be more reasonable. His fair market and residual value opinions were based on objective market data. Consequently, we rely on Daley's conclusions with respect to (1) the fair market values of the K-Mart and Shared equipment, (2) the residual values of the K-Mart and Shared equipment, and (3) petitioner's projected equipment rental income from its over lease residual interests.

We find as an ultimate fact that as of September 28, 1995, the K-Mart photo processing and Shared computer equipment had no residual value. We further find as an ultimate fact that as of September 28, 1995, petitioner's prospect for realizing equipment rental income and/or other income from the over lease residual

interests was de minimis or nonexistent.  We hold that, as of September 28, 1995, petitioner's residual lease interests had minimal or no fair market value.

### c. Petitioner's Lease Strip Deal's Economic Profit Potential

As of September 28, 1995, the K-Mart and Shared equipment would have had no estimated residual value, and the fair market value of the residual lease interests was nominal or zero.  In addition, the second lease strip deal, aside from potential tax benefits, lacked any demonstrable objective, practical, economic profit potential.  Accordingly, we hold that petitioner's second lease strip deal fails to meet the second prong of our inquiry into its economic substance.  See ACM Pship. v. Commissioner, 157 F.3d at 246-248; Casebeer v. Commissioner, 909 F.2d at 1363.

Because of our holding, it is unnecessary to address petitioner's argument that rental income should not be discounted to present value in valuing the lease strip deal profit potential.  See ACM Pship. v. Commissioner, 157 F.3d at 259-260 (agreeing on this point with T.C. Memo. 1997-115).  In addition, there is no need to address respondent's argument that modest or inconsequential profits relative to petitioner's claimed substantial potential tax benefits are insufficient to imbue an otherwise questionable second lease strip deal with economic substance.  See id. at 258; Sheldon v. Commissioner, 94 T.C. at 767-768.

### 6. Conclusion as to the Economic Substance of Petitioner's Lease Strip Deal

Petitioner did not have a valid nontax business purpose for entering into the second lease strip deal. Aside from potential tax benefits, the second lease strip deal did not have any objectively demonstrable, practical economic profit potential for petitioner. The transactions for the second lease strip deal were effected through various participating and pass-through entities, a number of which either were related to petitioner or were owned and/or controlled by others who regularly cooperated with petitioner and/or Crispin in lease strip deals and/or other types of transactions. The other participants involved in the first and second lease strip deals, in most instances, were not acting at arm's length and shared a common interest in inflating the values of the underlying equipment and the values of the leases and residual interests to generate substantial potential tax benefits for the ultimate beneficiaries/customers. As Raynault testified, CFX put up the only meaningful amount of capital to be derived by the participants and others involved in setting up the first deal.

Much of the purported debt and other payment obligations incurred in lease strip deals were to be offset by circuitous cashflows among the participants. For example, the supposedly high-basis $14.125 million EQ and $4,056,220 Jenrich equipment purchase installment notes played key roles in the plan to

produce substantial potential tax benefits in the lease strip deals. CFX was to claim approximately $13.8 million in net rental expense deductions during the master lease. Petitioner sought to claim deductions in the $3 to $4 million range for net rental payments during the over lease. Yet the respective master lease and over lease purported rental payments would equal, coincide with, and be completely offset by the purported equipment installment note payments CFX and petitioner were to receive.

In deciding the extent to which a nonrecourse note may be accorded economic substance, a number of courts have relied heavily on whether the fair market value of the underlying property was within a reasonable range of its stated purchase price. E.g., Estate of Franklin v. Commissioner, 544 F.2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Hager v. Commissioner, 76 T.C. 759 (1981); see Hilton v. Commissioner, 74 T.C. 305, 363 (1980), affd. 671 F.2d 316 (9th Cir. 1982); cf. Frank Lyon Co. v. United States, 435 U.S. 561 (1978) (where, among other things, the buyer-lessor in a sale-leaseback transaction was personally liable on the mortgage).

In addition, the mere labeling of a note as recourse is not controlling. A note's recourse label does not preclude inquiry into the adequacy of the collateral securing an alleged purchase

money debt.  <u>Waddell v. Commissioner</u>, 86 T.C. 848, 901-903 (1986), affd. 841 F.2d 264 (9th Cir. 1988).  We have held that recourse notes were not to be treated as bona fide debt for tax purposes where the possibility that the notes would be paid was illusory and no actual intent existed to pay them.  <u>Ferrell v. Commissioner</u>, 90 T.C. 1154, 1186-1190 (1988); <u>Durham Farms #1, J.V. v. Commissioner</u>, T.C. Memo. 2000-159, affd. 59 Fed. Appx. 952 (9th Cir. 2003).

The purported debt issued in connection with the first and second lease strip deals is not valid indebtedness.  With respect to the $4,056,220 Jenrich equipment installment note and the $10,000 and $1,000 Lexington notes issued to CMACM, there was no bona fide intent to pay or to enforce those purported debt obligations on the part of the issuers and holders of the notes. Mallin (who advised Jenrich and was instrumental in bringing about Jenrich's involvement in the second lease strip deal transactions) and Koehler (Lexington's sole shareholder) essentially viewed Jenrich's and Lexington's participation in those second lease strip deal transactions as an accommodation to petitioner and Crispin.

It is also highly questionable whether Jenrich and Lexington possessed sufficient financial resources to meet their respective "debt obligations".  In any event, the Jenrich "note payments" equaled, coincided with, and were completely offset by the

purported over lease rental payments that would be "owed" Jenrich by CMACM (petitioner's wholly owned subsidiary).  Also, the $4,056,220 Jenrich note was expressly stated to be a nonrecourse obligation.  "Payment" of the $4,056,220 note was stated to be "secured" by the equipment and the "Lessor Rights" thereto.  With respect to the $10,000 and $1,000 Lexington notes, those notes were unsecured notes, and Lexington appeared to possess minimal, if any, financial resources.

Significantly, the over lease agreement (which Jenrich signed as lessor) involves a lease term that provided CAP and later petitioner, Okoma, and Lexington with no actual over lease residual interests in the K-Mart and Shared equipment.  As previously indicated, this so-called over lease agreement ambiguity escaped not only the notice of petitioner, CAP, Okoma, and Lexington, but also that of others (including Crispin, petitioner's personnel, and Koehler) representing them in their second lease strip deal transactions.  Moreover, the fact that there was no residual lease period was not corrected.  This apparent inattention and lack of due care upon the part of Crispin, petitioner's personnel, and Koehler confirms, among other things, that no bona fide intent existed to have Jenrich and Lexington pay their respective purported debt obligations.

In actuality, Crispin, Koehler, Mallin, petitioner, and others viewed the $4,056,220 Jenrich note and the $10,000 and $1,000 Lexington notes as having no practical economic effect. Their actions evidence that they themselves viewed the notes as merely being part of the paper facade needed to support substantial tax benefits for petitioner. Accordingly, the $4,056,220 Jenrich note and the $10,000 and $1,000 Lexington notes are not considered valid indebtedness for tax purposes.

On the basis of the foregoing, we hold that the second lease strip deal lacks economic substance and is not to be respected for tax purposes. See Frank Lyon Co. v. United States, supra; Knetsch v. United States, 364 U.S. at 366; Gregory v. Helvering, 293 U.S. 465 (1935); ACM Pship. v. Commissioner, 157 F.3d at 231; Casebeer v. Commissioner, 909 F.2d at 1363; Nicole Rose Corp. v. Commissioner, 117 T.C. at 336. Clearly, the combination of steps and transactions in the second lease strip deal had no meaningful purpose other than to generate tax benefits.

B. Petitioner's Entitlement to Its Claimed Deductions

Because we have held that the second lease strip deal lacked economic substance, it follows that petitioner is not entitled to its claimed rental expense deductions of $414,041 and $237,853 for its taxable years ended November 30, 1996 and 1997, respectively.

Similarly, the $4,056,220 Jenrich note disposition also lacked economic substance. Among other things, the $4,056,220 Jenrich note did not represent valid indebtedness. We accordingly hold that petitioner is not entitled to its claimed note disposition losses of $459,221 and $1,178,012 for its taxable years ended November 30, 1996 and 1997, respectively.

Finally, on the basis of all of the foregoing, we hold that petitioner is not entitled to its claimed $404,000 NOL carryover deduction to its taxable year ended November 30, 1996. That $404,000 NOL resulted from petitioner's claiming a $1,982,825 second lease strip deal "rental expense" deduction for its 1995 taxable year.

II.   Petitioner's $2,052,900 Ordinary Loss and $1,859,135 Bad Debt Deduction

    A.   Petitioner's Claimed Deductions--the Debt vs. Equity Issue

For its taxable year ended November 30, 1997, petitioner claimed a $2,052,900 ordinary loss and a $1,859,135 bad debt deduction. These deductions are based upon advances by petitioner to Cap Corp. through 1997.

Generally, section 165(a) allows a deduction for losses sustained during the taxable year that are not compensated for by insurance or otherwise. If stock in a corporation becomes worthless during a taxable year, the taxpayer's loss will be treated as a capital loss. Sec. 165(g)(1). As relevant to this

case, the term "security" includes shares of stock in a corporation, unless those shares are in a corporation affiliated with a taxpayer that is a domestic corporation.[23]  Sec. 165(g)(2)(A) and (3).

Absent the applicability of a specific statutory provision prescribing ordinary loss treatment, losses from the sale or exchange of a capital asset are treated as capital losses.  Secs. 65, 1222(2), (4).  Section 1221 broadly defines a "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)," subject to enumerated exceptions for certain kinds of property.  Specifically, with respect to stock in a corporation, unless the taxpayer is a securities dealer within the meaning of section 1221(1), the stock is deemed to be capital and the taxpayer's other business motive for holding that stock is irrelevant.  Sec. 1221; Ark. Best Corp. v. Commissioner, 485 U.S. 212, 215-218, 221-223 (1988).  In the case of a corporate taxpayer, a capital loss may not be deducted against that taxpayer's ordinary income.  Secs. 165(f), 1211(a).

---

[23]Cap Corp. and petitioner were not affiliated corporations. Further, if held to be debt for tax purposes, the advances from petitioner in controversy would not be "securities" for purposes of sec. 165(g), as the Cap Corp. promissory notes evidencing those advances did not have interest coupons and were not issued in registered form.  See sec. 165(g)(2)(C).

Section 166(a)(1), on the other hand, generally allows a deduction for a debt that becomes worthless during a taxable year. In the case of a corporate taxpayer, section 166(a) allows an ordinary deduction for a worthless debt, regardless of whether the debt is a business or nonbusiness debt. Sec. 1.166-1(a), Income Tax Regs.; cf. sec. 166(d)(1); sec. 1.166-5(a), Income Tax Regs.

Sections 165 and 166 are mutually exclusive. In situations where both sections might otherwise be applicable, section 166--the specific statute--controls over section 165--the general statute. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 189 (1934).

The parties disagree about whether the advances by petitioner to Cap Corp. are to be treated as equity as opposed to debt. The Court of Appeals for the Ninth Circuit, which barring an agreement otherwise would be the venue for appeal in this case, has identified the following 11 factors to be considered in making this determination: (1) The names given to the documents evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payments of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest

between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain loans from outside lending institutions. Bauer v. Commissioner, 748 F.2d 1365, 1368 (9th Cir. 1984), revg. T.C. Memo. 1983-120; A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970); O.H. Kruse Grain & Milling v. Commissioner, 279 F.2d 123, 125-126 (9th Cir. 1960), affg. T.C. Memo. 1959-110; Anchor Natl. Life Ins. Co. v. Commissioner, 93 T.C. 382, 400 (1989). No one factor is controlling or decisive, and the court must look to the particular circumstances of each case. Bauer v. Commissioner, supra at 1368. Analysis of these factors, including objective evidence of the intent of the parties, is a guide to the resolution of the ultimate issue of whether the parties intended the advances to create debt or equity. Id. at 1367-1368; A.R. Lantz Co. v. United States, supra at 1333-1334; Anchor Natl. Life Ins. Co. v. Commissioner, supra at 401.

    B. Application of the 11-Factor Test

       1. Names Given to the Documents

The issuance of a stock certificate indicates an equity contribution. In contrast, the issuance of a bond, debenture, or note is indicative of indebtedness. Estate of Mixon v. United States, 464 F.2d 394, 403 (5th Cir. 1972); Anchor Natl. Life Ins. Co. v. Commissioner, supra at 404.

Cap Corp. issued promissory notes as evidence of the 1995 through 1997 advances.  The record also reveals that Crispin and Koehler effectively were the parties to all documents and transactions.  All of Cap Corp.'s outstanding shares were held by Crispin and Koehler.  Crispin and Koehler were also close, longtime business associates and friends.  Crispin was CMA's 98-percent shareholder and ultimate decision maker.  Where, as here, the corporate "debtor" is closely held and related to its "creditor", the form of the transaction and the labels used by the parties may lessen the probative quality of evidence.  In the setting we consider, Crispin and Koehler were able to manipulate the transactions and create whatever appearance would be of benefit to them or the structured activities.  See Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968); Anchor Natl. Life Ins. Co. v. Commissioner, supra at 406-407.  Moreover, by 1995, Cap Corp. had serious insolvency problems and an abiding need for operating funds from petitioner.

Although the documents were cast as notes, the form is largely offset by the lack of arm's-length parties and Cap Corp.'s apparent inability to repay the advances.

### 2.  Presence or Absence of a Fixed Maturity Date

"The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation.  The absence of the same on the other hand would indicate that

repayment was in some way tied to the fortunes of the business, indicative of an equity advance." Estate of Mixon v. United States, supra at 404; Anchor Natl. Life Ins. Co. v. Commissioner, supra at 405.

The January 1, 1995, and December 1, 1996, promissory notes specified November 30, 1996 and 1997, respective payment dates. Sometime before October 1996, however, Crispin and Koehler realized that Cap Corp. was insolvent and would not be able to repay the outstanding advances. They thus began the planning of a debt conversion transaction to relieve Cap Corp. of substantially all of its outstanding obligations to petitioner.

Under the plan, petitioner was to be repaid only a small portion of the total outstanding advances. Notwithstanding the uncertainty of repayment, petitioner advanced an additional $443,657 to Cap Corp. between October 31 and November 30, 1996. On December 2, 1996, in the conversion transaction, Cap Corp. was relieved of the obligation to repay $2.259 million. The remaining $500,000 was rolled over into the December 1, 1996, promissory note. Cap Corp. remained insolvent even after the December 2, 1996, debt conversion transaction, and its potential for earnings was greatly reduced after it parted with the CKS stock. In spite of these circumstances, petitioner advanced an additional $1.257 million to Cap Corp. during 1997.

Although there were fixed dates for repayment, a factor that favors petitioner's position, any advantage to petitioner is largely undercut by Crispin's, Koehler's, and petitioner's conduct. The circumstances and their actions show that they did not believe, or could not have reasonably believed, the advances would be repaid by the specified note maturity dates. See Fin Hay Realty Co. v. United States, supra at 698 (noting that although a purported corporate debtor issued demand notes for the advances, the actual economic reality was that those notes would not be repaid until some distant time in the future); Cuyuna Realty Co. v. United States, 382 F.2d 298, 301-302 (1967) (reasoning that an advance, though qualifying at the time made as a valid debt for tax purposes, may later lose that status for subsequent taxable years when the purported creditor ceases to act like a reasonable creditor).

### 3. Source of the Repayment

If repayment is contingent upon earnings or is to come from a restricted source, such as a judgment recovery, dividends, or profits, an equity interest is indicated. Estate of Mixon v. United States, supra at 405; Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 287-288 (1990). In such a case, the lender acts "'as a classic capital investor hoping to make a profit, not as a creditor expecting to be repaid regardless of the company's success or failure.'" Calumet Indus., Inc. v.

Commissioner, supra at 287-288 (quoting In re Larson, 862 F.2d 112, 117 (7th Cir. 1988)). Likewise when circumstances make it impossible to estimate when an advance will be repaid because repayment is contingent upon future profits, or repayment is subject to a condition precedent, or where a condition may terminate or suspend the obligation to repay, an equity investment is indicated. Affiliated Research, Inc. v. United States, 173 Ct. Cl. 338, 351 F.2d 646, 648 (1965).

At trial, Koehler was questioned about petitioner's 1995 and 1996 advances to Cap Corp. He indicated that, by causing petitioner to make the advances, Crispin was "rolling the dice" because repayment depended on Cap Corp.'s making sales, especially through CKS, its subsidiary. After the debt conversion, Cap Corp.'s serious financial problems continued and its earnings capacity also dramatically declined because CKS was no longer a source of earnings.

Accordingly, as to the source of repayment, this factor favors respondent.

### 4. The Right To Enforce the Payments

The right to enforce the repayment residing in the entity making the advance is indicative of bona fide debt. Estate of Mixon v. United States, 464 F.2d at 405.

Technically, petitioner had a right to enforce payment pursuant to the terms set forth in the January 1, 1995, and December 1, 1996, promissory notes.  In actuality, as discussed above in connection with the prior three factors, payment of the note principal and interest depended wholly on Cap Corp.'s success.

This factor supports petitioner but is outweighed by other attendant circumstances making uncertain Cap Corp.'s actual payment of the note principal and interest to petitioner.

### 5.  Participation in Management

The right to participate in the management of a business by the entity advancing funds demonstrates that the advance may not have been bona fide debt and instead was intended as an equity investment.  Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 603 (1991).

From 1995 through December 2, 1996, Crispin and Koehler continued to manage Cap Corp. in the same manner as before 1995. Koehler was in charge of Cap Corp.'s day-to-day operations, but he would consult with Crispin at least weekly.  After the December 2, 1996, debt conversion, Crispin took over Cap Corp.'s day-to-day operations.

This factor is neutral with respect to petitioner's advances during 1995 and 1996.  It favors respondent with respect to petitioner's advances during 1997.

### 6. Status Relative to Other Creditors

Whether an advance is subordinated to obligations to other creditors bears on whether the taxpayer advancing funds was acting as a creditor or an investor. Estate of Mixon v. United States, 464 F.2d at 406. In addition, "Failure to demand timely repayment effectively subordinates the intercompany debt to the rights of other creditors who receive payment in the interim." Am. Offshore, Inc. v. Commissioner, supra at 603 (citing Inductotherm Indus., Inc. v. Commissioner, T.C. Memo. 1984-281, affd. without published opinion 770 F.2d 1071 (3d Cir. 1985)).

Petitioner acknowledges that Cap Corp. used a large portion of petitioner's advances to make interest payments to Cap Corp.'s third-party creditors. Effectively, petitioner subordinated its Cap Corp. advances for the benefit of these third-party creditors in three ways. First, petitioner advanced $443,657 to Cap Corp. on October 31 and November 30, 1996, and then on December 2, 1996, participated in the debt conversion transaction relieving Cap Corp. of $2.259 million in advances. Second, petitioner agreed to have the remaining $500,000 of advances rolled over into the December 1, 1996, promissory note. Finally, petitioner advanced an additional $1.257 million to Cap Corp. during 1997, knowing that (1) after December 2, 1996, Cap Corp. remained insolvent, (2) a significant portion of the funds furnished in

1997 would be used to pay Cap Corp.'s third-party creditors, and (3) it was highly unlikely that Cap Corp. would be able to repay petitioner by the November 30, 1997, maturity date.

This factor favors respondent.

### 7. Intent of the Parties

"[T]he inquiry of a court in resolving the debt-equity issue is primarily directed at ascertaining the intent of the parties". A.R. Lantz Co. v. United States, 424 F.2d at 1333 (citing Taft v. Commissioner, 314 F.2d 620 (9th Cir. 1963), affg. in part and revg. in part T.C. Memo. 1961-230).  The objective and subjective expressions of intent, as well as the other 10 enumerated factors, must be examined.  Id. at 1333-1334.  The resolution of a debt versus equity question involves consideration of the substance and reality and not merely the form.  Form used as a subterfuge to shield the real essence of a transaction should not control.  Id. at 1334.

Cap Corp. and petitioner treated the advances in controversy as debt in that Cap Corp. issued petitioner the January 1, 1995, and December 1, 1996, promissory notes documenting the advances and accrued interest.  The advances were recorded as debt by Cap Corp. and assets by petitioner on their respective financial statements.

Although the advances were treated as debt on the books, neither Cap Corp. nor petitioner intended, or reasonably could have intended, the advances to be bona fide debt. Petitioner made the advances to keep Cap Corp. from defaulting upon its promissory notes to third-party creditors and to pay Cap Corp.'s operating expenses. During 1995 through most of 1996, petitioner made the advances knowing they were risky. During late 1996 and 1997, petitioner knew that it would not recover most, if any, of the funds advanced to Cap Corp., but it continued to inject funds into Cap Corp. Petitioner knew its repayment prospects with respect to these later advances were highly uncertain. We conclude that neither petitioner nor Cap Corp. genuinely intended the advances to be bona fide debt or reasonably intended the advances to be repaid. See id. at 1333-1334.

This factor favors respondent.

### 8. Thin or Adequate Capitalization

The purpose of examining the debt-to-equity ratio in characterizing an advance is to determine whether a corporation is so thinly capitalized that it would be unable to repay an advance. Such an advance would be indicative of venture capital rather than a loan. Bauer v. Commissioner, 748 F.2d at 1369.

Cap Corp.'s 1995 financial statement reflects total assets of $755,731 and total liabilities of more than $5 million. The 1996 financial statement reflects total assets of $150,958 and total liabilities of almost $4.6 million.

Respondent contends that from January 1, 1995, through December 1, 1996, Cap Corp. was thinly capitalized. Respondent points out that Cap Corp.'s financial statements reflect a debt-to-equity ratio of at least 5 to 1 from 1995 through December 2, 1996. Following the December 2, 1996, debt conversion of $2.259 million, Cap Corp. remained insolvent and unable to benefit from CKS's future profitability.

Petitioner argues that thin capitalization is not decisive by itself and that a loan to a seemingly insolvent entity may nonetheless be treated as debt if repayment was reasonably expected. Petitioner acknowledges, however, that Cap Corp. lacked tangible assets to serve as security or a repayment source for the advances.

We agree with respondent that up until December 2, 1996, Cap Corp. was thinly capitalized and that, even after the December 2, 1996, debt conversion, Cap Corp.'s earnings base was insufficient to meet its obligations to third-party creditors and petitioner under the December 1, 1996, promissory note. As discussed above, the December 1, 1996, promissory note was reduced to $500,000 as of November 30, 1996, and petitioner continued to make advances

of $1.257 million during 1997. Cap Corp. also owed approximately $2.5 million on outstanding notes issued to third-party creditors. With respect to the $2.5 million, Cap Corp. was obligated to make interest payments and pay off the note principal during December 1997 or December 1998. See Cuyuna Realty Co. v. Commissioner, 382 F.2d at 302 (noting that although the taxpayer-parent's later concession that some of its purported loans to its subsidiary were equity might significantly improve the debt-to-equity ratio of its subsidiary, the subsidiary still would lack a sufficient earnings base to carry the remaining outstanding indebtedness).

This factor favors respondent.

### 9. Identity of Interest

Advances made by a sole shareholder are more likely to be committed to the risk of the business than are advances made by creditors who are not shareholders. Ga. Pac. Corp. v. Commissioner, 63 T.C. 790, 797 (1975). The sole shareholder is also less likely to be concerned than a third party would be with the safeguards normally used to protect such advances. Id.

At all times relevant, Crispin and Koehler were Cap Corp.'s only shareholders. Petitioner itself held no formal stock interest in Cap Corp. However, Crispin was CMA's 98-percent shareholder and ultimate decision maker.

Crispin's and Koehler's stock ownership in Cap Corp. and petitioner's lack of a direct stock interest in Cap Corp. are of less import because of Cap Corp.'s serious insolvency problems and need for funds from Crispin and/or petitioner. At all times relevant, little, if any, shareholder equity existed in Cap Corp. The financial statements reflect no shareholder equity during 1996, with Cap Corp.'s liabilities exceeding assets by several multiples. At all relevant times, Crispin effectively controlled and directed Cap Corp. In this connection, Koehler testified that, during 1995 and 1996, he would contact Crispin whenever Cap Corp. lacked funds to cover its required interest payments to third-party creditors and its other operating expenses. There is an identity of interest between petitioner's role as purported creditor and Crispin's role as Cap Corp.'s controlling shareholder.

This factor favors respondent.

10. Payment of Interest Only Out of Dividends

This factor is essentially the same as the third factor; i.e., source of the payments. Hardman v. United States, 827 F.2d 1409, 1414 (9th Cir. 1987). It focuses, however, on how the parties treated interest. In that regard, "A true lender is concerned with interest." Am. Offshore, Inc. v. Commissioner, 97 T.C. at 605 (citing Estate of Mixon v. United States, 464 F.2d at 409). The failure to insist on interest payments may indicate

that a purported lender expects to be paid out of future earnings or through an increased market value of its equity interest.  Id. at 605 (citing Curry v. United States, 396 F.2d 630, 634 (5th Cir. 1968)).

Although the Cap Corp. promissory notes provided that accruals of interest be added to the outstanding balance, Cap Corp. did not make and was not financially capable of making interest payments after August 1995.  Payment of accrued interest depended entirely on profits that Cap Corp. did not have and was not likely to earn in the future.

This factor favors respondent.

11.  Ability To Obtain Loans From Outside Lending Institutions

"[T]he touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms."  Segel v. Commissioner, 89 T.C. 816, 828 (1987) (citing Scriptomatic, Inc. v. United States, 555 F.2d 364, 367 (3d Cir. 1977)).  A corporation's ability to borrow from outside lending institutions gives the transaction the appearance of a bona fide debt and indicates that the purported creditor acted in the same manner toward the corporation as ordinary reasonable creditors would have acted.  Hardman v. United States, supra (citing Estate of Mixon v. United States, supra at 410).

Cap Corp. would not have been able to obtain similar loans from an outside lending institution. Petitioner acknowledges that: (1) Cap Corp. was insolvent from 1995 through 1997 and needed funds from petitioner to pay its operating expenses and those of its subsidiaries, including substantial interest payments due Cap Corp.'s third-party creditors; (2) Cap Corp. would have failed long before 1999 without the advances in controversy; and (3) Cap Corp., during 1995 and 1996, lacked tangible assets to serve as security and/or a repayment source for loans. By October 1996 Crispin and Koehler realized Cap Corp. was bankrupt, with liabilities exceeding assets by several multiples. Even after the December 2, 1996, debt conversion, Cap Corp.'s insolvency problems continued and its potential earnings base declined dramatically.

This factor favors respondent.

C. Conclusion and Holdings

After considering the above factors, we hold that petitioner's advances to Cap Corp. are not to be treated as bona fide debt for tax purposes. Those advances, instead, constituted equity in Cap Corp.

On brief, however, petitioner argues that it is entitled to ordinary deductions irrespective of whether the advances are classified as debt or equity. Petitioner argues that, under certain circumstances, courts have allowed taxpayers an ordinary

loss upon the disposition of their stock or upon its becoming worthless even though they were not securities dealers. See, e.g., Irwin v. United States, 558 F.2d 249, 252 (5th Cir. 1977) (holding that for a taxpayer to be entitled to an ordinary deduction upon his stock's becoming worthless, the taxpayer was required to show (1) the purchase of that stock was necessary for the taxpayer's business, and (2) his motive for the purchase was to promote his business purpose and investment was not a predominant motive); W.W. Windle Co. v. Commissioner, 65 T.C. 694, 713 (1976) (holding that where a substantial investment motive exists in a predominantly business-motivated acquisition of corporate stock, the stock is a capital asset). Petitioner asserts that it made the advances in controversy to protect or promote its own business.

The cases petitioner relies on, however, predate the Supreme Court's holding in Ark. Best Corp. v. Commissioner, 485 U.S. 212 (1988). These pre-Ark. Best Corp. cases were decided under a doctrine that had evolved from the case of Corn Prods. Refining Co. v. United States, 350 U.S. 46 (1955), in which the Supreme Court recognized a nonstatutory exception to the definition of capital asset. In that case the exception concerned whether certain futures contracts that were acquired and held for a business purpose qualified for ordinary loss as a noncapital asset.

In <u>Ark. Best Corp. v. Commissioner</u>, <u>supra</u> at 223, however, the Supreme Court clarified these earlier cases by holding that a taxpayer's motivation in purchasing an asset is irrelevant to the question of whether the asset comes within the general definition of a capital asset in section 1221.  Petitioner does not argue, and the facts do not indicate, that its equity interest meets any section 1221 exclusion from the general definition of a capital asset.  Hence, under the authority of the <u>Ark. Best Corp.</u> case, petitioner's advances in controversy (which we have held to constitute a stock/equity interest rather than debt for tax purposes) cannot result in an ordinary deduction upon either the disposition of that stock/equity interest or its becoming worthless.  See <u>Azar Nut Co. v. Commissioner</u>, 94 T.C. 455 (1990) (rejecting, on the basis of the <u>Ark. Best Corp.</u> case, the business-connection-business-motivation rationale used in certain pre-<u>Ark. Best Corp.</u> cases), affd. 931 F.2d 314 (5th Cir. 1991); <u>Sellers v. Commissioner</u>, T.C. Memo. 2000-235; see also <u>Maginnis v. United States</u>, 356 F.3d 1179, 1185 (9th Cir. 2004) (noting, among other things, that the Supreme Court's decision in the <u>Ark. Best Corp.</u> case rejected the "motive" test).

On the basis of the foregoing, we hold that petitioner is not entitled to ordinary deductions in connection with the $2,052,900 and $1,859,135 amounts claimed for its taxable year ended November 30, 1997.

III.  The $2 Million Fee

Petitioner did not include as income for its taxable year ended November 30, 1997, a $2 million portion of the $2.5 million fee from NSI.  Petitioner paid the $2 million to CKH, and CKH reported the $2 million in income for its short taxable year ended March 31, 1997.  The transfer to CKH was to match the income with $2 million in losses that was already available to CKH in order to eliminate the incidence of tax on the $2 million of income earned by petitioner.

A.  The Assignment of Income Doctrine

In United States v. Newell, 239 F.3d 917 (7th Cir. 2001), the Court of Appeals for the Seventh Circuit held that a 50-percent S corporation shareholder was required to include in income payments for services rendered by the S corporation, even though the payments were made to an offshore Bermuda corporation.  In United States v. Newell, supra at 919-920, the Court of Appeals reviewed various leading cases under the assignment of income doctrine and explained:

> To shift the tax liability, the assignor must relinquish his control over the activity that generates the income; the income must be the fruit of the contract or the property itself, and not of his ongoing income-producing activity.  See Blair v. Commissioner, 300 U.S. 5, * * * (1937); Greene v. United States, 13 F.3d 577, 582-83 (2d Cir. 1994).  This means, in the case of a contract, that in order to shift the tax liability to the assignee the assignor either must assign the duty to perform along with the right to be paid or must have completed performance before he

assigned the contract;[24] otherwise it is he, not the contract, or the assignee, that is producing the contractual income--it is his income, and he is just shifting it to someone else in order to avoid paying income tax on it.  To state the point differently, an anticipatory assignment of income, that is, an assignment of income not yet generated, as distinct from the assignment of an income-generating contract or property right, does not shift the tax liability from the assignor's shoulders, Helvering v. Horst, 311 U.S. 112, * * * (1940); Boris I. Bittker et al., Federal Income Taxation of Corporations and Shareholders ¶ 7.07 (4th ed. 1979), unless, as we said, the duty to produce the income is assigned also, so that the assignor is out of the income-producing picture.  In Lucas v. Earl, [281 U.S. 111 (1930)] where the taxpayer had assigned an interest in his future income to his wife, the [Supreme] Court held that when the income came in, it was his income, because it was generated by his efforts, including his decisions about what to charge for his services and what expenses to incur.  See also Commissioner v. Sunnen, 333 U.S. 591, 608-10, * * * (1948); Greene v. United States, supra, 13 F.3d at 582. Similarly, the income on the contract with ADIA [the S corporation's client] was generated by the exertions of Inc. [the S corporation], not of Ltd. [ the Bermuda offshore corporation]

The Court of Appeals also explained that the taxpayer's position in that case was weak because, among other things, the Bermuda offshore corporation was the taxpayer's alter ego and it was doubtful whether there ever was any assignment of the contract to the Bermuda offshore corporation.  Id. at 920.

---

[24]Income the assignor had already earned would be recognized by and taxed to the assignor under the assignment of income doctrine.  Helvering v. Eubank, 311 U.S. 122 (1940); Schneer v. Commissioner, 97 T.C. 643, 648 (1991).

B.  The Parties' Arguments

1.  Petitioner's Arguments

Petitioner contends that the assignment of income doctrine should not be applied with respect to the $2 million portion of the NSI consulting fee paid over to CKH.  In support of its argument, petitioner relies heavily on Crispin's and Koehler's testimony concerning an alleged oral fee-splitting agreement. Crispin and Koehler testified that it was necessary for petitioner to involve CKH because petitioner, unlike CKS (a securities dealer), would not be able to claim the $87 million ordinary loss from the sale of the RD stock.  Their testimony is that, shortly after NSI retained petitioner, Crispin and Koehler orally agreed that petitioner would split the fee and pay $2 million to CKH.  Petitioner asserts that this alleged oral agreement created something in the nature of a joint venture with petitioner and CKH as partners working together to earn and, ultimately, to share the fee.

Petitioner also relies on Crispin's testimony that, during its 1997 taxable year, petitioner entered into similar fee-splitting agreements with third parties that assisted petitioner in performing services for petitioner's clients.  Petitioner contends that respondent did not dispute the validity of other fee-splitting agreements.  Petitioner also argues that respondent would not have disputed its alleged fee-splitting agreement if,

instead, petitioner had reported the full $2.5 million fee and claimed a $2 million business deduction with respect to the portion paid to CKH.

Alternatively, petitioner argues that if the $2 million is includable in its income, then petitioner is entitled to a $2 million deduction for the payment to CKH.

### 2. Respondent's Arguments

Respondent argues that the assignment of income doctrine applies and that the entire $2.5 million NSI fee is includable in petitioner's taxable income for 1997. Respondent asserts that petitioner earned the $2.5 million fee. As to the alleged fee-splitting agreement, respondent maintains that Crispin's and Koehler's testimony is self-serving and not credible. Respondent also contends that the failure to execute a contemporaneous written document memorializing a $2 million fee-splitting agreement is suspect.

Although acknowledging that petitioner was arranging the sale of the RD stock by a securities dealer like CKS, respondent maintains that petitioner has failed to show that any portion of its $2 million payment to CKH is deductible as a business expense.

C. <u>Analysis and Holding</u>

1. <u>Petitioner's Agreement With NSI</u>

The December 1, 1996, consulting agreement executed by NSI and petitioner required that petitioner provide consulting services to NSI Enterprises and its affiliates for a 3-year period ending November 30, 1999, in exchange for a $2.5 million fee, payable in full on the December 1, 1996, contract date. The consulting agreement contained no mention of NSI's plan to divest itself of its tax benefit lease. As we have found, NSI's and petitioner's actual agreement was that petitioner would find a buyer for Corisma (the NSI affiliate holding the tax benefit lease and the RD stock) and assist NSI in consummating a sale of Corisma's shares. As we understand that agreement, petitioner in return for its services would earn and receive a $2.5 million fee from NSI. Upon concluding the sale of LLDEC's (Corisma's) shares to CKH on January 30, 1997, NSI paid the agreed $2.5 million fee to petitioner. See <u>Greene v. United States</u>, 13 F.3d 577, 581 (2d Cir. 1994); <u>Ferguson v. Commissioner</u>, 108 T.C. 244, 259 (1997), affd. 174 F.3d 997 (9th Cir. 1999).

2. <u>CKH's and Petitioner's Purported Fee-Splitting Agreement</u>

Crispin testified that he had estimated that $4 million would be earned from the NSI tax deal and that he had proposed to Koehler that CKH and petitioner share this $4 million equally. In his testimony, Crispin also asserted that a securities dealer would have demanded as much as 90 percent of the fee in question.

Koehler testified that he agreed to $2 million of the $4 million for CKH because of his experiences on other deals with Crispin where fees were split 50-50.

We find Crispin's and Koehler's testimony on this matter to lack credibility. Their testimony contained significant discrepancies, inconsistencies, and lapses regarding the purported oral agreement. For example, under the alleged fee-splitting agreement, petitioner agreed to pay to CKH $2 million or 80 percent of the NSI fee. Considering the large amount of documentation used for related transactions, we find it incredible that petitioner and CKH would not memorialize an agreement to pay $2 million. Crispin and Koehler were experienced businessmen whose transactions were based on written documentation, yet they maintained that it was unnecessary for CKH and petitioner to execute a $2 million fee-splitting agreement because they "trusted" one another. Similarly, Crispin claimed that CKH did not issue a bill for the $2 million payment because it was transferred in accordance with the oral agreement.

During the trial, Crispin was asked about another transaction between petitioner and CKS that had been documented (the Investment Banking Services Agreement on February 1, 1997). Crispin explained that a written agreement was needed because Koehler and CKS had numerous creditors and petitioner's rights to the money had to be established or memorialized.

Crispin also maintained that Koehler was in the "driver's seat" because petitioner needed to have CKS, a securities dealer, in the transaction.  Contrary to Crispin's and petitioner's claim, the record reflects that Crispin and/or petitioner had practical control of CKH and Koehler.  As discussed earlier, Cap Corp. was insolvent and could not continue operating without capital from petitioner.  As of September 30, 1996, Cap Corp. purportedly owed petitioner approximately $2.287 million.  By the time Crispin and Koehler formed CKH on October 22, 1996, they realized that Cap Corp. was insolvent.  In the December 2, 1996, debt conversion transaction petitioner permitted CKH to acquire CKS from Cap Corp. by means of petitioner's cancellation of $2.1599 million of Cap Corp.'s obligation regarding the advances.  Even after the debt conversion, CKH and Koehler were at the mercy of Crispin and/or petitioner for funds, as CKS continued to incur considerable monthly expenses and suffer substantial operating losses.

In addition to effective control over CKH and Koehler, petitioner held a large preferred stock interest in CKH.  Koehler estimated that petitioner's preferred stock represented 98 percent of the equity in CKH.  We conclude that CKH and petitioner did not enter into a fee-splitting agreement regarding the NSI fee.

In the same manner as the lease strip deal, Crispin and petitioner contrived the $2 million fee-splitting agreement to shift petitioner's income to CKH to be offset and sheltered by CKH's losses. We conclude that the principal reason petitioner transferred $2 million of income to CKH was to avoid the incidence of tax on $2 million in earned fee income. There was no business purpose for this transfer.

We also note that LLDEC, which was CKH's wholly owned subsidiary, deducted the $524,657 paid to petitioner for arranging the Decatur realty sale and denominated it an "investment banking fee". We find it anomalous that CKH and LLDEC would have been charged an "investment banking fee" by petitioner--if CKH and petitioner were joint venturers as contended.

On the record presented in this case, there is no credible evidence supporting a fee-splitting agreement or a joint venture or partnership agreement between petitioner and CKH. No partnership return was filed and no partnership income reported. See Bagley v. Commissioner, 105 T.C. 396, 419 (1995), affd. on other issues 121 F.3d 393 (8th Cir. 1997).

We accordingly hold that petitioner failed to report $2 million of the $2.5 million fee in income for 1997. See United States v. Newell, 239 F.3d at 919-920.

3.  <u>Petitioner's Entitlement to a Business Deduction</u>

Petitioner makes the alternative argument that it is entitled to a business deduction for the $2 million paid to CKS. Petitioner bears the burden of establishing its entitlement to business deductions.  See Rule 142(a).  Petitioner paid $2 million to CKH, and CKH's wholly owned subsidiary CKS received $134,000 following the redemption of the RD stock by CKS.

No probative evidence has been offered regarding the appropriate fee for participation in a transaction like the NSI tax deal.  Crispin's testimony that a securities dealer might have required up to 90 percent of the income is self-serving and unreliable.  We are also skeptical about Crispin's claims with respect to the purported risks CKH and/or CKH's subsidiaries undertook in "acquiring" and disposing of the Decatur realty, the RD stock, and the tax benefit lease.

Nonetheless, CKH did enter into the transactions on January 30, 1997, pursuant to which NSI consummated its sale of LLDEC's (Corisma's) shares to CKH.  Following these January 30, 1997, transactions, CKH transferred the RD stock and the tax benefit lease from LLDEC (now a wholly owned subsidiary of CKH) to CKS (CKH's other wholly owned subsidiary).  CKS engaged in additional transactions to dispose of the RD stock and the tax benefit lease.  An independent securities dealer would have charged petitioner for involvement and participation in the NSI tax deal.

Bearing heavily against petitioner because of the ambiguity and inexactitude of the proof it offered, we hold that petitioner is entitled to a $500,000 deduction for 1997 with respect to CKS's participation in the NSI tax deal. See <u>Cohan v. Commissioner</u>, 39 F.2d 540, 544 (2d Cir. 1930).

IV. <u>Petitioner's Advances to Koehler</u>

Petitioner advanced $76,705 to Koehler before 1996. Petitioner acknowledges that it mistakenly deducted this $76,705 as a miscellaneous expense on its 1996 taxable year return. Petitioner now asserts it is entitled to deduct the $76,705 as a business bad debt.

Section 166(a) permits a deduction for debts that become worthless during a taxable year. Petitioner contends that its advances to Koehler became wholly worthless during petitioner's 1996 taxable year, and that it is entitled to deduct those advances as wholly worthless debts under section 166(a)(1).[25]

A bad debt is deductible only for the year in which it becomes worthless. Sec. 166(a)(1); <u>Dustin v. Commissioner</u>, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47, 48 (9th Cir. 1972). For purposes of section 166, the debt must be a bona fide debt; i.e., one which arises under a debtor-creditor relationship and is based on a valid and enforceable obligation to pay a fixed and

_____

[25]Petitioner has not claimed that it is entitled to deduct those advances as partially worthless debts under sec. 166(a)(2).

determinable sum of money.  A gift or contribution to capital is not considered to be a debt for purposes of section 166.  In re Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976); Zimmerman v. United States, 318 F.2d 611, 612 (9th Cir. 1963); sec. 1.166-1(c), Income Tax Regs.

The existence of a bona fide debtor-creditor relationship is a question of fact to be determined on the basis of the facts and circumstances in each case.  Kean v. Commissioner, 91 T.C. 575, 594 (1988); Fisher v. Commissioner, 54 T.C. 905, 909 (1970).  An essential element of a bona fide debtor-creditor relationship is the existence of a good faith intent on the part of the recipient to repay and a good faith intent on the part of the person advancing the funds to enforce repayment.  Fisher v. Commissioner, supra at 909-910.  In determining the debtor's and creditor's subjective intent, we consider whether there was a reasonable expectation of repayment in light of the economic realities of the situation.  Id. at 910.

Petitioner contends that the $76,705 in advances to Koehler represents bona fide debt.  Respondent, on the other hand, contends that the advances were made without reasonable expectation of repayment.  We conclude that these advances were not bona fide debt.

Koehler's August 31, 1994, demand promissory agreement did not have a fixed maturity date or a repayment schedule. See Boatner v. Commissioner, T.C. Memo. 1997-379 (wherein the notes in question, among other things, had no fixed maturity dates or repayment schedules), affd. without published opinion 164 F.3d 629 (9th Cir. 1998).

The record reveals that, at the time the advances of $76,705 were made, petitioner could not have had a reasonable expectation of repayment. Koehler had been experiencing financial difficulties since his divorce in 1987 or 1988. From at least 1992 through 1996, Koehler's financial condition was extremely poor and he did not have the capability to repay the advances. Koehler testified that, if petitioner or any of his other creditors had pressed him for payment during 1993, he would have filed for bankruptcy. Yet from August 31 through December 30, 1994, petitioner advanced $45,000 to Koehler.[26] See Fisher v.

---

[26]We essentially consider window dressing Richard Koehler's (Koehler) execution of the Aug. 31, 1994, demand promissory agreement. Until Aug. 31, 1994, no note existed evidencing and covering the earlier $31,705 that petitioner advanced Koehler, possibly as far back as the 1980s. The record further does not reflect whether Koehler paid petitioner any "interest" with respect to the $31,705 in advances before Aug. 31, 1994. Similarly, we also consider window dressing Koehler's monthly "interest" payments totaling $4,555 to petitioner from Aug. 31, 1994, through Dec. 1, 1995. That $4,555 represented less than one of the nine $5,000 semimonthly payments that petitioner made to Koehler from Aug. 31 through Dec. 30, 1994.

Commissioner, supra at 910-911; see also Zimmerman v. United States, 318 F.2d at 613.

The $76,705 in advances appears to be something other than loans. Essentially petitioner expected Koehler to repay these advances "when he could". Koehler did not furnish security, and petitioner did not seek repayment of the advances. On the basis of the record, we conclude that Crispin arranged the advances from petitioner to help his friend and business associate, Koehler, who was in financial need. See McCain v. Commissioner, T.C. Memo. 1987-285, affd. per order (9th Cir., Apr. 11, 1989); see also Boatner v. Commissioner, supra.

On the basis of the foregoing, we hold that petitioner is not entitled to deduct a $76,705 bad debt for its taxable year ended November 30, 1996.

## V.   Is Petitioner Liable for Penalties Under Section 6662?[27]

Respondent determined that petitioner was liable for penalties under section 6662 for its taxable years ended November 30, 1996 and 1997, with respect to underpayments attributable to the lease strip deal deductions. In particular, respondent determined that petitioner was liable for a 20-percent penalty on the portions of the underpayments attributable to rental expense deductions as being due to petitioner's negligence, disregard of

---

[27]Although respondent disallowed petitioner's $404,000 net operating loss (NOL) carryover deduction for 1996, respondent did not determine that petitioner was liable for an accuracy-related penalty on the portion of its underpayment attributable to the $404,000 NOL.

rules or regulations, or substantial understatement of income tax. Respondent also determined that petitioner was liable for a 40-percent gross valuation overstatement penalty on the portions of the underpayments attributable to petitioner's claimed note disposition losses. Alternatively, with respect to the note disposition losses, respondent determined that petitioner was liable for a 20-percent penalty under section 6662 due to petitioner's negligence, disregard of rules or regulations, substantial understatement of income tax, or substantial valuation misstatement.

Section 6662 imposes a 20-percent accuracy-related penalty on the portion of an underpayment attributable to (1) negligence or disregard of rules or regulations, (2) substantial understatement of income tax, or (3) substantial valuation misstatement under chapter 1 of the Internal Revenue Code. Sec. 6662(a), (b)(1), (2), and (3). In general, where a gross valuation misstatement is involved, an accuracy-related penalty under section 6662(a) is imposed in an amount equal to 40 percent of the portion of an underpayment attributable to a gross valuation misstatement. Sec. 6662(h)(1).

Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code or to exercise ordinary and reasonable care in the preparation of a tax return. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence may be indicated where a taxpayer fails to make a

reasonable attempt to ascertain the correctness of a deduction that would seem to a reasonable and prudent person "too good to be true" under the circumstances. Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. Disregard of the rules or regulations "includes the provisions of the Internal Revenue Code, temporary or final Treasury regulations * * * and revenue rulings or notices * * * issued by the Internal Revenue Service and published in the Internal Revenue Bulletin." Sec. 1.6662-3(b)(2), Income Tax Regs.

A substantial valuation misstatement generally constitutes a "gross valuation misstatement" if the value or adjusted basis of any property claimed on a return is 400 percent or more of the amount determined to be the correct value or adjusted basis. Sec. 6662(h)(2).

The accuracy-related penalty under section 6662(a) will not apply to any part of a taxpayer's underpayment of tax if, with regard to that part, the taxpayer establishes reasonable cause and that the taxpayer acted in good faith. Sec. 6664(c).

Petitioner arranged its own lease strip deal and claimed over $4.2 million in tax benefits for 1995, 1996, and 1997. As we have held, petitioner did not have a valid nontax business purpose for entering into the lease strip deal. In seeking substantial deductions vastly greater than economic outlay, petitioner was indifferent to the deal's lack of economic substance and economic profit potential. This is plainly shown

by petitioner's casual attitude toward the bona fides of the transactions. Crispin and petitioner failed to notice or correct the fact that the over lease agreement did not provide petitioner with any residual interests in the K-Mart photo processing and Shared computer equipment. Petitioner prepared its own in-house analysis and valuation of the over lease residual rights before entering into the September 28, 1995, transaction with CAP. Presumably, a reasonable review and/or appraisal would have uncovered this fundamental flaw. Petitioner also entered into a series of transactions over a 21-month period from November 27, 1995, through September 1, 1997, to dispose of its "lease position" without recognizing or correcting this flaw.

Petitioner through Crispin and other employees who were also experienced in leasing transactions cannot hide behind the professionals who were involved in the first lease strip deal. Petitioner engaged in a blatant scheme to obtain deductions greatly disproportionate to its economic investment in transactions that lacked economic substance or a business purpose. The facts and circumstances of this case reflect that petitioner did not have reasonable cause and lacked good faith in entering into the transactions and claiming the deductions regarding the lease strip deal. Petitioner's reliance upon the Marshall & Stevens appraisal, the Murray Devine appraisal, and the Thacher Proffitt tax opinion (all of which had been issued to CFX concerning the first lease strip deal and the master lease

residual interests) was not reasonable, as that advice, among other things, had not been furnished by disinterested, objective advisers but by advisers involved in marketing the first lease strip deal to CFX.  See Rybak v. Commissioner, 91 T.C. 524, 565 (1988); see also Neonatology Associates, P.A. v. Commissioner, 299 F.3d 221, 233-234 (3d Cir. 2002) (holding that the reliance "must be objectively reasonable"), affg. 115 T.C. 43 (2000).  Indeed, given petitioner's experience and expertise arranging lease strip deals and its awareness of Notice 95-53, 1995-2 C.B. 334, petitioner was aware and forewarned but chose to proceed with the transactions and claim the deductions.  See Freytag v. Commissioner, 89 T.C. 849, 889 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

We further reject petitioner's argument that it qualifies under the reasonable cause and good faith exception of section 6664(c).  In that regard, petitioner claimed that it relied upon and followed the advice of a national accounting firm that reviewed petitioner's proposed 1996 return.  As previously discussed, the second lease strip deal had no economic substance and the $4,056,220 Jenrich note was not a valid indebtedness.  Among other things, it has not been shown that:  (1) The accounting firm's advice was based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances; (2) petitioner had disclosed all relevant facts to the accounting firm; and (3) the accounting firm's advice was

based on reasonable factual or legal assumptions. Sec. 1.6664-4(c), Income Tax Regs.; see Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. T.C. Memo. 1987-217.

Petitioner was negligent and/or disregarded rules or regulations as to the portions of its underpayments attributable to its claimed lease strip deal rental expense deductions. We hold that petitioner is liable for the 20-percent section 6662(a) penalties for its taxable years ended November 30, 1996 and 1997, equal to 20 percent of those portions of its underpayments attributable to its claimed lease strip deal rental expense deductions.

The portions of petitioner's underpayments attributable to its claimed note disposition losses constitute gross valuation misstatements under section 6662(h). As we have held, the second lease strip deal lacked economic substance and the $4,056,220 Jenrich note was not a valid indebtedness; i.e., had no value. Petitioner claimed an adjusted basis in the Jenrich note in an amount exceeding $4 million, an amount that was immensely greater than the correct adjusted basis of zero. See sec. 1.6662-5(g), Income Tax Regs. We hold that petitioner is liable for the 40-percent accuracy-related penalties under section 6662(h) for its taxable years ended November 30, 1996 and 1997, on those portions of its underpayments attributable to its claimed note disposition losses. See Gilman v. Commissioner, 933 F.2d 143, 149-152 (2d Cir. 1991), affg. T.C. Memo. 1989-684.

Because we have found that the subject transactions are without substance or business purpose and that petitioner and its officers were fully aware of the lack of bona fides of the factual underpinnings for the transactions, there could be no substantial authority or reasonable belief or cause on petitioner's part that would allow it to avoid the application of the section 6662 penalties in this case.

In light of the foregoing and to reflect concessions by the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

**[REPORTER'S NOTE: This opinion was amended by Order dated February 14, 2005.]**

## APPENDIX A

### Steps 1 - 9



## Steps 10-14



Aardan Leasing

Jenrich

EQ

Okoma Enterprises

CMACM

CAP

Step 14 – Nov. 27, 1995 CMACM transferred to Okoma its interest in the Jenrich Note to the extent of the pre-existing user leases with K-Mart Corp. In exchange, Okoma assumed CMACM's obligation to pay rental payments to Jenrich and assumed part of CAP's liability to EQ.

Step 10 – Aug. 31, 1995 EQ sold the equipment and its right to receive rent payments under the Master Lease from CFX to CAP. CAP issued a Note for $750,000 to EQ and assumed EQ's obligation to make payments to CFX under the EQ Installment Note.

Step 11-1 Aug. 31, 1995 CAP sells the Shared Medical and K-Mart equipment and assigns Master Lease with respect to only the Shared Medical and K-Mart equipment to Jenrich in exchange for Jenrich Note for $4,056,220 and short term note for $215,000.

Step 11-2 Aug. 31, 1995 Jenrich leases the Shared Medical and K-Mart equipment and assigns the right to receive rent from CFX back to CAP under the Over Lease.

Step 12 – Sep. 1, 1995 CAP sold the rent payments attributable to the Shared Medical and K-Mart equipment owed to CAP by CFX to Aardan Leasing for the assumption of a portion of CAP's obligation to CFX and $25,000.

Step 13 - September 28, 1995 CAP conveyed the Jenrich Note and $215,000 of CAP's obligation to EQ to CMACM in return for 10 shares of capital stock of CMACM.

Steps 15 - 17



Step 15 – Oct. 31, 1996 CMACM transfers 25% of its interest in the Jenrich Note attributable to the Shared Medical Equipment to First Lexington Leasing, Inc. for a promissory note in the amount of $10,000.

Step 17 - July 20, 1998 CMACM redeemed from CAP the 10 shares of its stock that it has issued to CAP on September 28, 1995 for $500.

Step 16 – Sep. 1, 1997 CMACM transfers 75% of its interest in the Jenrich Note attributable to the Shared Medical Equipment to First Lexington Leasing, Inc. for a promissory note in the amount of $1,000.

## APPENDIX B



APPENDIX C

Existing End User Equipment Rental
Monthly Payments That HCA Purchased

| Date | K-Mart | Shared | Amoco | HIP NY | Martin Marietta |
|---|---|---|---|---|---|
| 12-1-94 | $61,236 | $46,657 | -- | $130,000 | $40,914 |
| 1-1-95 | 61,236 | 46,657 | -- | 130,000 | 40,914 |
| 2-1-95 | 61,236 | 46,657 | $70,300 | 130,000 | 40,914 |
| 3-1-95 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 4-1-95 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 5-1-95 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 6-1-95 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 7-1-95 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 8-1-95 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 9-1-95 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 10-1-95 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 11-1-95 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 12-1-95 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 1-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 2-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 3-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 4-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 5-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 6-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 7-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 8-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 9-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 10-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 11-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 12-1-96 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 1-1-97 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 2-1-97 | 61,236 | 46,657 | 70,300 | 130,000 | 40,914 |
| 3-1-97 | 61,236 | 36,267 | 70,300 | 130,000 | 40,914 |
| 4-1-97 | 61,236 | -- | 70,300 | 130,000 | 40,914 |
| 5-1-97 | 61,236 | -- | 70,300 | 130,000 | 40,914 |
| 6-1-97 | 61,236 | -- | 70,300 | 130,000 | -- |
| 7-1-97 | 20,395 | -- | 70,300 | 130,000 | -- |
| 8-1-97 | -- | -- | 70,300 | 130,000 | -- |
| 9-1-97 | -- | -- | 70,300 | 130,000 | -- |
| 10-1-97 | -- | -- | 70,300 | 130,000 | -- |
| 11-1-97 | -- | -- | 70,300 | 130,000 | -- |
| 12-1-97 | -- | -- | 70,300 | 130,000 | -- |
| 1-1-98 | -- | -- | 70,300 | -- | -- |
| 2-1-98 | -- | -- | 70,300 | -- | -- |
| 3-1-98 | -- | -- | 70,300 | -- | -- |
| 4-1-98 | -- | -- | [1]70,300 | -- | -- |

[1]The Amoco payments continue at $70,300 per month through Jan. 1, 2000.